UNITED STATES of America, Plaintiff–Appellee–Cross–Appellant,

v.

John Fife SYMINGTON, III, Defendant–Appellant–Cross–Appellee.

Nos. 98–10070, 98–10071 and 98–10143.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1998.

Filed June 22, 1999.

Terence J. Lynam, John M. Dowd, Luis R. Mejia, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for the defendant-appellant-cross-appellee.

George S. Cardona and David J. Schindler, Assistant United States Attorneys, Los Angeles, California, for the plaintiff-appellee-cross-appellant.

Before: FLETCHER and TASHIMA, Circuit Judges, and FITZGERALD,* District Judge.

FLETCHER, Circuit Judge:

John Fife Symington, III appeals from his conviction and 30–month prison sentence on five counts of making false statements to financial institutions in violation of 18 U.S.C. § 1014 and one count of wire fraud in violation of 18 U.S.C. § 3231. Principal among the issues on appeal is Symington's claim that his Sixth Amendment right to an impartial jury was violated when the district court dismissed a juror on the eighth day of deliberations. Symington also appeals from the district court's denial of his post-verdict motion for judgment of acquittal on three of the § 1014 counts. The government cross-appeals, challenging the district court's post-verdict dismissal of one § 1014 count for insufficient evidence, and its dismissal, several months after trial, of 11 unresolved counts for violation of the Speedy Trial Act. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. §§ 3731 & 3742. We reverse Symington's conviction, but affirm the district court's treatment of the evidentiary sufficiency and Speedy Trial Act issues.

## I.

Prior to being elected Governor of Arizona in 1991, Symington was a commercial real estate developer in Phoenix. Between 1986 and 1992, Symington and his wholly-owned company obtained several construction and permanent loans from various lenders to support his real estate projects. In order to obtain many of these loans, Symington agreed to guarantee full or par-

* The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation.

tial repayment of the loans himself. In support of those guarantees, Symington was required to submit personal financial statements detailing his financial position. Symington prepared those statements himself. The indictment charged that many of the statements were materially false in that they overstated the value of Symington's assets, understated or failed to disclose his liabilities, and overstated the value of his interest in the real estate projects he was developing. Symington was also alleged to have submitted contradictory versions of statements bearing the same "as of" date.

A 23–count superseding indictment was returned against Symington on January 9, 1997. Prior to trial, the district court granted Symington's motion to dismiss one count as unconstitutionally vague. Trial by jury on the remaining 22 counts began on May 13, 1997, and lasted through the first week of August, 1997. At the end of the trial, the district court granted Symington's motion for judgment of acquittal on one count, but denied the motion as to all other counts. The remaining 21 counts were submitted to the jury on August 8, 1997.

On August 15, 1997, the jury sent a note to the district court judge stating, "Your Honor, we respectfully request direction. One juror has stated their final opinion prior to review of all counts." The judge discussed the matter with counsel for both sides and then wrote back to the jurors reminding them of their duty to participate in deliberations with each other, but emphasizing also that each juror should make up his or her own mind on the charges. On August 19, the jury sent the judge another, more detailed note. The note read, in pertinent part:

> We have earnestly attempted to follow your last directive to continue with our deliberations. However, the majority of the jurors sincerely feel that the juror in question cannot properly participate in the discussion with us.
>
> Reasons:

> Inability to maintain a focus on the subject of discussion.
>
> Inability to recall topics under discussion.
>
> Refusal to discuss views with other jurors.
>
> All information must be repeated two to three times to be understood, discussed, or voted on. Immediately following a vote, the juror cannot tell us what was voted.
>
> We question the ability to comprehend and focus on the information discussed.
>
> This is the same juror of concern in our last communication.

The juror in question was Juror Cotey, a woman apparently in her mid–70s.

After discussing the matter with counsel for both sides, the judge separately questioned each member of the jury to determine the nature of the problem. Counsel participated in the questioning. During the questioning, each of the jurors (other than Cotey) agreed that the note accurately described their concerns. The jurors suggested that the best solution would be for the judge to dismiss Juror Cotey. They all stated that Cotey appeared confused and unfocused during deliberations. Presiding Juror Carlson, for example, stated that

> [a]t first we almost felt it was someone that had their mind made up, which we were trying to work with and around. Everyone is certainly entitled to their opinion. That's what this is about. But as it progressed and we tried to press for that opinion, because maybe it would affect ours and we wanted that input to add to ours and share, we got such rambling answers that we were all looking at each other around the circle like, my gosh, this answer's so off the wall it is not connected to the discussion in any way.

At other times, the jurors seemed less concerned about Cotey's ability to deliberate than about her apparent unwillingness

to explain her thinking about the case. Although Juror Witter described Cotey as "very intelligent," Juror Seaman stated that Cotey "refuse[s] to discuss her views.... She just seems to have her mind set. She says she doesn't have to explain herself to anybody."

The statements of some jurors indicated that their frustration with Cotey may have derived more from their disagreement with her on the merits of the case, or at least from their dissatisfaction with her defense of her views. Juror Witter stated that "[t]here's one element that [Cotey] felt strongly about," and that Cotey "would stick on two of the elements every time, because she didn't—she just kept getting stuck on two elements because that's how she felt and she wouldn't really explain to us her rationale of her way she wanted to vote." Juror Bamond saw Cotey as an obstacle to reaching a verdict: "[W]e are blocked and blocked and blocked. And I don't want to be blocked any more.... It's a long trial, it's frustrating, you know."

When the judge questioned Cotey, she stated that she was prepared to continue deliberating. She noted that the other jurors' frustration with her might be because "I can't agree with the majority all the time, at least temporarily. And I'm still researching and looking for more in the case." Cotey also complained of pressure from the other jurors: "I found myself backed up against the wall for a vote every time, an objection to my vote on a specific count or an element of the count." Cotey stated, however, that she was prepared to stand by her position even though she was clearly in the minority: "I realized that I was the one isolated. But I also realized I told [another juror] I was a separate juror and had a right and I didn't like being bullied down on a point." Cotey claimed that she was willing to discuss elements of the case with the other jurors, but that she became intimidated when everyone talked at once and demanded that she justify her views as soon as she stated them.

The judge decided to dismiss Cotey because she was "either unwilling or unable to deliberate with her colleagues." The judge acknowledged that "no juror should yield a thoughtfully-held position simply to arrive at a verdict," but found that "there has been nothing stated by any of the jurors that would indicate that that is the situation here." Accordingly, the judge excused Cotey "for just cause for being either unwilling or unable to participate in the deliberative process in accordance with the instructions of the Court." On August 20, at Symington's request, the judge seated one of the alternate jurors in Cotey's place and instructed the jury to begin its deliberations anew. The next day, Symington moved for a mistrial. He argued that the disagreement between Cotey and the other jurors was rooted in the merits of the case, and that dismissing Cotey prejudiced her view of the case. The district court denied the motion. Symington renewed the claim in a post-trial motion for a new trial, and the district court again denied it.

On September 3, 1997, the jury returned verdicts convicting Symington on seven counts (counts 10 and 11 and 13 to 16, involving submitting false statements to financial institutions, and count 21 involving wire fraud) and acquitting him on three counts. The jury was unable to reach a verdict on the remaining 11 counts, and the district court declared a mistrial as to those counts. On January 20, 1998, the district court granted Symington's motion for acquittal on count 11 but denied the motion in all other respects. On February 2, 1998, the district court sentenced Symington to a prison term of 30 months. On March 10, 1998, the district court dismissed the 11 mistried counts without prejudice, for violation of the Speedy Trial Act.

Symington timely appealed from his conviction and sentence, and the government timely cross-appealed.

## II.

Symington argues that the district court committed reversible error when it dis-

missed Juror Cotey on the eighth day of deliberations after finding that she was "either unwilling or unable to deliberate." Symington contends that the other jurors' complaints about Cotey were—or at least very possibly may have been—rooted in substantive disagreements about the merits of the case, and that dismissing Cotey on account of those disagreements violated his Sixth Amendment right to an impartial jury. *See* U.S. CONST. amend VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ..."). The government responds that Juror Cotey was in fact either unable or unwilling to deliberate properly, and that her dismissal was warranted under Rule 23(b) of the Federal Rules of Criminal Procedure.

◼ Rule 23(b) provides that "if the [district] court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors."[1] We review a district court's dismissal of a juror during deliberations for abuse of discretion. *See United States v. Beard,* 161 F.3d 1190, 1193 (9th Cir.1998); *United States v. McFarland,* 34 F.3d 1508, 1512 (9th Cir.1994). We do so because as a general matter, "the district court [is] in the best position to evaluate the jury's ability to deliberate." *Beard,* 161 F.3d at 1194 (internal quotation marks omitted). Thus, although "just cause" for dismissal under Rule 23(b) generally pertains to physical incapacity or absence due to religious observance, this and other courts have upheld the dismissal of a juror when the district court determined that the juror was unable to deliberate impartially. *See id.* at 1193–94 (dismissal of two jurors

proper after they became involved in an ongoing, bitter argument leaving them emotionally unstable and unable to deliberate); *United States v. Egbuniwe,* 969 F.2d 757, 760–61 (9th Cir.1992) (dismissal proper where juror's impartiality in doubt after juror's girlfriend was arrested by police); *United States v. Walsh,* 75 F.3d 1, 4–5 (1st Cir.1996) (dismissal proper where juror was mentally unstable and unable to engage in rational discussion); *United States v. Huntress,* 956 F.2d 1309, 1312 (5th Cir. 1992) (dismissal proper where juror diagnosed by doctor as suicidal and paranoid).

◼ The district court's discretion in this area is not unbounded, however. Indeed, "a court may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the evidence." *United States v. Brown,* 823 F.2d 591, 596 (D.C.Cir.1987); *see United States v. Ross,* 886 F.2d 264, 267 (9th Cir.1989) (citing *Brown* as describing a limit on district court discretion). The reason for this prohibition is clear: "To remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict." *United States v. Thomas,* 116 F.3d 606, 621 (2d Cir.1997); *see Brown,* 823 F.2d at 596 ("If a court could discharge a juror on the basis of such a request, then the right to a unanimous verdict would be illusory.").[2]

◼ Symington argues that the other jurors sought Cotey's removal because they disagreed with her on the merits of the case. It is undisputed that if this is true—if the other jurors did seek to remove Cotey because they disagreed with her views on the merits—then dismissal of Cotey was improper. "[W]hen a request for dismissal stems from the juror's view of the sufficiency of the evidence ..., a judge may not discharge the juror: the

---

1. Once the district court decided to dismiss Juror Cotey, Symington requested that the court substitute an alternate juror instead of proceeding with 11 jurors as prescribed by the letter of Rule 23(b). Such substitution is permissible where the defendant expressly waives his right to proceed with 11 jurors.

*See United States v. McFarland,* 34 F.3d 1508, 1511 (9th Cir.1994).

2. It is undisputed that Symington, as a federal criminal defendant, has a constitutional right to a unanimous verdict. *See United States v. Ullah,* 976 F.2d 509, 513 n. 13 (9th Cir.1992).

judge must either declare a mistrial or send the juror back to deliberations with instructions that the jury continue to attempt to reach agreement." *Brown,* 823 F.2d at 596. The question here is what evidentiary standard the district court ought to employ in making that determination. Specifically, how likely must it be that a juror's views on the merits underlies the request for her removal, before the district court is precluded from removing the juror? We have not previously answered this question in the federal criminal context.[3]

■ A trial judge faces special challenges when attempting to determine whether a problem between or among deliberating jurors stems from disagreement on the merits of the case. "[A] court may not delve deeply into a juror's motivations because it may not intrude on the secrecy of the jury's deliberations." *Brown,* 823 F.2d at 596; *see Thomas,* 116 F.3d at 619. There are important reasons why a trial judge must not compromise the secrecy of jury deliberations. First, if trial judges were permitted to inquire into the reasoning behind jurors' views of pending cases, "it would invite trial judges to second-guess and influence the work of the jury." *Thomas,* 116 F.3d at 620. Second, a trial judge's examination of juror deliberations risks exposing those deliberations to public scrutiny. Such exposure, in turn, would jeopardize the integrity of the deliberative process. *See id.* at 618–19. As Justice Cardozo put it, "Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." *Clark v. United States,* 289 U.S. 1, 13, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *see* Frank A. Bacelli, Note, *United States v. Thomas: When the*

*Preservation of Juror Secrecy During Deliberations Outweighs the Ability to Dismiss a Juror for Nullification,* 48 Cath. U.L.Rev. 125, 153 n. 215 (1998) ("Commentators long have feared that the disclosure of deliberations to the general public could affect a juror's decisionmaking process during trial and could potentially undermine the public's confidence in the jury system."); Benjamin S. DuVal, Jr., *The Occasions of Secrecy,* 47 U. Pitt. L.Rev. 579, 646 (1986) ("The secrecy of the jury room, like that of the Supreme Court conference, is designed to promote the free and candid interchange of views."); Note, *Public Disclosures of Jury Deliberations,* 96 HARV. L. REV. 886, 889 (1983) ("Juror privacy is a prerequisite of free debate, without which the decisionmaking process would be crippled.").[4]

In refraining from exposing the content of jury deliberations, however, a trial judge may not be able to determine conclusively whether or not a juror's alleged inability or unwillingness to deliberate is simply a reflection of the juror's opinion on the merits of the case, an opinion that may be at odds with those of her fellow jurors. Thus, in the rare case where a request for juror dismissal focuses on the quality of the juror's thoughts about the case and her ability to communicate those thoughts to the rest of the jury, "the court will likely prove unable to establish conclusively the reasons underlying" the request for dismissal. *Brown,* 823 F.2d at 596. In such cases a trial court lacks the investigative power that, in the typical case, puts it in the "best position to evaluate the jury's ability to deliberate." *Beard,* 161 F.3d at 1194.

The Second and D.C. Circuits have recognized this dilemma. *See Thomas,* 116 F.3d at 620–23; *Brown,* 823 F.2d at 595–

---

**3.** In *Perez v. Marshall,* 119 F.3d 1422 (9th Cir.1997), we faced a related question in the context of federal habeas review of a state conviction. We noted that "a trial court's findings regarding juror fitness are entitled to special deference" on habeas review. *Id.* at 1426. The difference in procedural posture between direct federal review and habeas-

based review makes *Perez* inapposite to this case.

**4.** The district judge in this case is to be commended for scrupulously avoiding any discussion of jurors' views on the merits when he questioned them about Juror Cotey.

97. Those cases both involved allegations that a juror was unwilling or unable to apply the law as instructed by the judge. In *Brown* a juror informed the judge that he was "unable to discharge [his] duties as a member of th[e] jury." 823 F.2d at 594. In *Thomas*, the jury complained that one juror had a "predisposed disposition" and that he was unwilling to decide the case under the law as instructed by the judge. 116 F.3d at 611. The Second and D.C. Circuits recognized that the trial judges in those cases could not have plumbed the depths of the problem without delving into the juror's views on the merits of the case. Thus, those courts held that "if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." *Brown*, 823 F.2d at 596; *Thomas*, 116 F.3d at 621–22 (quoting *Brown*).

We hold that if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror.[5] Under such circumstances, the trial judge has only two options: send the jury back to continue deliberating or declare a mistrial. *See Brown*, 823 F.2d at 596. This rule is attentive to the twin imperatives of preserving jury secrecy and safeguarding the defendant's right to a unanimous verdict from an impartial jury. We are confident that "[g]iven the necessary limitations on a court's investigatory authority in cases involving a juror's alleged refusal [or inability] to follow the law, a lower evidentiary standard could lead to the removal of jurors on the basis of their view of the sufficiency of the prosecution's evidence." *Thomas*, 116 F.3d at 622.[6]

5. We emphasize that the standard is any *reasonable* possibility, not any possibility whatever. It may be that "[a]nything is possible in a world of quantum mechanics." *United States v. Watkins*, 983 F.2d 1413, 1424 (7th Cir. 1993) (Easterbrook, J., dissenting). Indeed, as an early scholar of the law of evidence observed, "[E]ven the most direct evidence can produce nothing more than such a high degree of probability as amounts to moral certainty." T. Starkie, Law of Evidence 478 (2d Ed. 1833). Thus, to prohibit juror dismissal unless there is no possibility at all that the juror was dismissed because of her position on the merits may be to prohibit dismissal in all cases. We believe that the standard of "reasonable possibility" in this context, like the standard of "reasonable doubt" in the criminal law generally, is a threshold at once appropriately high and conceivably attainable.

All members of the panel agree that "reasonable possibility" is the appropriate standard. The dissent, however, appears to define that standard rather differently. Analogizing from the Ninth Circuit Model Criminal Jury Instruction concerning "reasonable doubt," the dissent contends that a "reasonable possibility" is a possibility that leaves one " 'firmly convinced' that *the* impetus for [a juror's dismissal] was her position on the merits." dissent at 1098 (quoting 9th Cir. Crim. Jury Instr. 3.3 (1997)). As the dissent would have it, something is only reasonably possible if we are firmly convinced that it is true. This formulation is based on a misunderstanding of our Model Jury Instructions. Model Instruction 3.3 provides that *"[p]roof beyond a reasonable doubt* is proof that leaves you firmly convinced that the defendant is guilty." 9th Cir. Crim. Jury Instr. 3.3 (1997) (emphasis added). Properly analogized to the "reasonable possibility" context, the standard states that unless the available evidence is sufficient to leave one firmly convinced that the impetus for a juror's dismissal is unrelated to her position on the merits, the dismissal is improper.

6. Cases subject to this rule, we emphasize, are infrequent. In general, questions of juror bias or competence focus on "some event, or . . . relationship between a juror and a party, that is both easily identifiable and subject to investigation and findings without intrusion into the deliberative process." *Thomas*, 116 F.3d at 621. In those cases, "the presiding judge can make appropriate findings and establish whether a juror is biased or otherwise unable to serve without delving into the reasons underlying the juror's views on the merits of the case." *Id.* Since the district court's investigative authority is not constrained by the same jury secrecy concerns in those cases, the rule we announce here is not triggered. In cases where the allegations go to the quality and coherence of the juror's views on the merits, however, a trial judge may not be able to assess the juror's competence without ex-

■ Here, there was a reasonable possibility that Juror Cotey's views on the merits of the case provided the impetus for her removal.[7] While there may have been some reason to doubt Cotey's abilities as a juror, there was also considerable evidence to suggest that the other jurors' frustrations with her derived primarily from the fact that she held a position opposite to theirs on the merits of the case. Juror Witter asked the district judge to dismiss Cotey because otherwise the result would be "an undecided vote, a hung jury." Juror Bamond complained that because of Cotey, "we are blocked and blocked and blocked. And I don't want to be blocked any more." Cotey herself stated that she felt the other jurors were frustrated with her because "I can't agree with the majority all the time, at least temporarily." While the other jurors may not have thought their difficulties with Cotey stemmed from her position on the merits, such difficulties can certainly manifest themselves in concerns about a juror's reasonableness or general capacity as a juror. *See Thomas*, 116 F.3d at 622.[8]

We hold that because it was reasonably possible that the impetus for Juror Cotey's dismissal came from her position on the merits of the case, it was error to dismiss her.[9] Accordingly, we reverse Symington's conviction and vacate his sentence.

### III.

#### A.

■ Symington separately contends that the evidence was insufficient to convict him on counts 13 to 15 of the indictment. We must reach this claim even though we reverse his conviction. *See United States v. Aguilar*, 80 F.3d 329, 334 (9th Cir.1996) (en banc). "Because an appellate reversal of a conviction on the basis of insufficiency has the same effect as a judgment of acquittal, the Double Jeopardy Clause would preclude retrial" on counts 13 to 15 if we found the evidence insufficient to convict Symington on those counts. *United States v. McKoy*, 771 F.2d 1207, 1215 (9th Cir.1985). We review the sufficiency of the evidence supporting a conviction to determine whether, viewing

---

posing the content of the juror's views. The rule we announce today applies only to those cases.

7. In several places, the dissent characterizes our decision as holding that "Cotey's views on the merits of the case provided *the* impetus for her removal." Dissent at 1092. We reach no such conclusion. Rather, we hold that the evidence before the district court disclosed a *reasonable possibility* that Cotey's views on the merits provided the impetus for her removal. Because the issue involves the quality and coherence of Cotey's deliberations, and because the district court properly avoided compromising the secrecy of the jury's deliberations, the evidence available to the district court was necessarily limited. The district court had to evaluate the issue on the basis of that limited information, information insufficient to support any high degree of certainty as to the underlying motive for the attempt to have Cotey dismissed. In light of that limited evidence, we conclude that the district court could not have been "firmly convinced" that the impetus for Cotey's dismissal was unrelated to her position on the merits of the case. *See supra* n. 5.

8. Indeed, it appears that it was only because of their disagreement with Cotey on the merits that the other jurors had occasion to question her ability to deliberate. Juror Bamond suggested as much when he stated that keeping Cotey in the case would probably result in "an undecided vote, a hung jury" except for the *"few items that we—we do mutually agree upon."* (emphasis added). Had Cotey tended to agree with the other jurors on all points, they probably would never have noticed her alleged inability to defend or explain her views.

9. We express no opinion on whether Cotey was in fact capable of continuing with the deliberations. It may have been that she was not, and that mistrial was the only viable option. But because it was reasonably possible that the problems all stemmed from the other jurors' disagreement with her position on the merits, it was error to continue the case without her. There are, of course, other means by which a district court can ensure that the seated jurors are capable of participating effectively in deliberations. Voir dire is the primary mechanism. *See Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir.1998) (en banc).

the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Ross*, 123 F.3d 1181, 1184 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 733, 139 L.Ed.2d 670 (1998).

■ Counts 13 to 15 alleged that Symington violated 18 U.S.C. § 1014 by submitting materially false requests for disbursements on loans from Dai Ichi Kangyo Bank (DKB). 18 U.S.C. § 1014 subjects to criminal penalty anyone who "knowingly makes any false statement or report, or willfully overvalues any land, property, or security, for the purpose of influencing in any way" a federally insured financial institution. Symington contends that the government's evidence showed only that he submitted false statements to DKB, and that it was insufficient to support a conclusion that he did so knowingly or that he intended to influence DKB with those statements.

In 1987 and 1988, DKB loaned Symington and his affiliates a total of $127,000,000 for the development of two real estate projects. As part of the loan agreements, Symington personally guaranteed payment of up to $9,000,000, and promised to maintain a net personal worth of $4,000,000. Symington further agreed that his failure to maintain that net worth would put the loans into default. In order to obtain a loan disbursement, Symington was required to prepare and submit a "borrower's affidavit." One of the representations reaffirmed in each affidavit was Symington's promise to continue to maintain a net worth of $4,000,000.

Counts 13 to 15 relate to borrower's affidavits submitted by Symington when his net worth was less than $4,000,000. It is undisputed that Symington did submit affidavits reaffirming his agreement to maintain a net worth of at least $4,000,000 even after his net worth had sunk below that level. Symington testified at trial that the net worth requirement "never even crossed [his] mind" when he signed the draw requests. Nevertheless, we hold

that the jury could rationally have chosen to disbelieve Symington's testimony. At trial, evidence from Symington's own handwritten notes showed that he had shielded his financial statements from a full-fledged audit, so that no accountant could conclude that his net worth was less than $4,000,000. A rational juror could have inferred from this evidence that Symington was aware of the $4,000,000 requirement, and knew he did not meet it when he filed the false affidavits.

As to Symington's intent to influence DKB, the government introduced the evidence of Seiichi Chiba, the DKB loan officer responsible for the relevant loans. Chiba testified that DKB looked to the borrower's affidavits to ensure that there was no default under the terms of the loan. Chiba further testified that DKB relied on the veracity of the borrower's affidavits, that the net worth requirement was important to DKB, and that as soon as he learned Symington was in default under that requirement, he had to obtain special permission to continue the loan. Based on this evidence of the importance of the $4,000,000 requirement to DKB, a rational juror could have concluded that by submitting borrower's affidavits claiming to have met the requirement, Symington intended to influence DKB not to declare the loan in default. Indeed, Symington submitted the borrower's affidavits for the purpose of influencing DKB to continue to disburse funds.

We find, therefore, that there was sufficient evidence to convict Symington on counts 13 to 15.

### B.

■ In its cross-appeal, the government contends that the district court erred in granting Symington a post-verdict judgment of acquittal on count 11. Like counts 13 to 15, that count also charged Symington with violation of 18 U.S.C. § 1014. Count 11 charged that in a loan extension agreement with Valley National Bank (VNB) dated June 24, 1991, Symington

knowingly represented that his personal financial statement of December 31, 1990 was true and accurate, even though he knew that the statement was false. The jury voted to convict Symington on count 11, but the district court found insufficient evidence to support the conviction. Our mode of review here is the same as for counts 13 to 15: reviewing the evidence in the light most favorable to the government, we ask whether any rational trier of fact could have found Symington guilty on count 11 beyond a reasonable doubt.

In November, 1989 Symington signed a loan agreement with VNB for a loan of just under $900,000, to be repaid by May 30, 1991. In the agreement Symington attested that "the financial statement delivered to Bank by Borrower [Symington] is true, complete and correct in all respects and fairly presents the financial condition of Borrower as of the date hereof, and from the date of such financial statement until the date hereof, there has been no material change in the financial condition of the subject thereof." The loan agreement did not specify a date for the "financial statement delivered to Bank by Borrower," but the last financial statement delivered to VNB was Symington's December 31, 1988 financial statement (the 1988 statement). The loan agreement elsewhere provided that Symington would provide VNB with annual financial statements, and that he would maintain a net worth of not less than $4,000,000. Thus on May 8, 1990 Symington provided VNB with his December 31, 1989 financial statement (the 1989 statement), and on May 14, 1991 he submitted his December 31, 1990 statement (the 1990 statement). It was proved at trial that the 1990 statement was materially false, and that Symington falsely represented its accuracy to VNB when he submitted it.[10]

VNB granted Symington a short extension of the 1989 loan in June, 1991. Paragraph 5 of the extension agreement provided that Symington "hereby reaffirms to Bank the accuracy, as of the date hereof, of all of the respective representations and warranties made by him in the Note and Loan Agreement." Count 11 charged that in signing the extension agreement, Symington falsely represented the accuracy of his 1990 statement. However, the 1990 statement was not a "representation ... made by [Symington] in the Note and Loan Agreement." The original loan agreement referred to a "financial statement delivered to Bank." Since that agreement was signed on November 21, 1989, by its terms it cannot have referred to Symington's 1990 statement, since it did not yet exist. Thus, the loan extension agreement made no reference to the veracity of the 1990 statement. It merely reaffirmed Symington's representation that the statements made in the original loan agreement, including the 1988 statement submitted in conjunction with its signing, were accurate, as of the time they were made. Because a rational juror could not have found that the extension agreement referred to the 1990 statement, we affirm the district court's grant of judgment of acquittal on count 11. Symington may not be retried on that count.

IV.

■ The government also appeals from the district court's dismissal of 11 mistried counts for violation of the Speedy Trial Act, 18 U.S.C. §§ 3161–74. On September 13, 1997, the jury returned its verdict and announced that it was deadlocked on 11 counts. The district court declared a mistrial as to those counts (the mistried counts). Neither party acted further on the mistried counts until Symington's sentencing on February 2, 1998, when Symington moved for dismissal under the Speedy Trial Act. The district court granted the motion and dismissed the mistried counts without prejudice. We review

---

10. Symington was charged and convicted on a separate § 1014 count for submitting his false 1990 statement.

questions of law under the Speedy Trial Act de novo. *See United States v. George,* 85 F.3d 1433, 1436 (9th Cir.1996).

The Speedy Trial Act provides that "if the defendant is to be tried again following a declaration by the trial judge of a mistrial ... the trial shall commence within seventy days from the date the action occasioning the retrial becomes final." 18 U.S.C. § 3161(e). Time began to run under this provision on September 3, 1997. Thus, since more than 70 days elapsed between September 3, 1997 and February 2, 1998 when Symington moved to dismiss the mistried counts, dismissal was required unless the Speedy Trial Act should have been tolled for some or all of that interval. As to such tolling, § 3161(h) provides, in pertinent part:

> The following periods of delay shall be excluded in computing the time within which ... the trial ... must commence:
>
> (1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—
>
> . . .
>
> (F) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;
>
> . . .
>
> (J) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

18 U.S.C. § 3161(h).

When the jury announced its verdict on September 3, 1997, Symington moved for an extension of time (the extension motion) in which to file a post-trial motion for judgment of acquittal or new trial as to the counts on which the jury voted to convict. The district court took that motion under advisement and granted it on September 5, 1997. The two days from September 3 to September 5 were excludable from Speedy Trial Act calculations under § 3161(h)(1)(J) as time during which a "proceeding concerning the defen-

dant [was] actually under advisement by the court." Symington filed his post-trial motion for judgment of acquittal (the post-trial motion) on October 10, 1997. The district court heard argument on the motion on December 1, 1997, and took the matter under advisement until issuing an order resolving it on January 20, 1998. Even excluding the time from September 3 to 5, the Speedy Trial Act's 70–day period had passed well before the district court took the post-trial motion under advisement on December 1, 1997.

The government argues, however, that the entire period from September 3, 1997 (when Symington filed his extension motion) to January 20, 1998 (when the court rule on Symington's post-trial motion) should be excluded because it was a "period of delay resulting from other proceedings concerning the defendant." 18 U.S.C. § 3161(h)(1). The government correctly notes that "other proceedings" is not limited to those expressly listed in § 3161(h)(1). *See United States v. Lopez–Espindola,* 632 F.2d 107, 110 (9th Cir. 1980) ("the 'including but not limited to' language makes it clear that Congress did not intend to restrict the meaning of 'other proceedings' to those specifically ventured."). Accordingly, the government maintains that Symington's post-trial motion was an unenumerated "proceeding[ ] concerning defendant" under § 3161(h)(1), and that the entire pendency of the motion should be excluded from Speedy Trial Act calculations.

The government's argument is foreclosed by our decision in *United States v. Tertrou,* 742 F.2d 538 (9th Cir.1984). In *Tertrou,* we distinguished between pre-trial and post-trial motions:

> Under section 3161(h)(1)(F), any period of delay resulting from a pre-trial motion is excluded from the time of the filing of the motion through its disposition. Other types of proceedings not enumerated, such as post-trial motions, are cause for exclusion of the time that the matter is under advisement. *See* 18 U.S.C. § 3161(h)(1)(J).

*Id.* at 539. In *Tertrou*, a mistrial was first declared on all counts. The defendant subsequently filed a motion for judgment of acquittal on the mistried counts. The motion was still pending 70 days later, when the government initiated retrial proceedings. The district court allowed the retrial, treating defendant's post-trial motion as a pre-trial motion for Speedy Trial Act purposes and excluding the entire period during which the motion was pending. We reversed, holding that post-trial motions are covered only by § 3161(h)(1)(J). Accordingly, "only the period that [a post-trial] motion is under advisement is excluded." *Id.* at 539.

Tertrou controls our treatment of the issue here.[11] Under *Tertrou*, the pendency of Symington's post-trial motion was not excludable under § 3161(h)(1), and the district court properly dismissed the mistried counts.

## V.

Because the record evidence discloses a reasonable possibility that the impetus for Juror Cotey's dismissal was her position on the merits of the case, we hold that her dismissal was improper. Accordingly, we REVERSE Symington's conviction and VACATE his sentence.[12] We AFFIRM the district court on the other issues reached herein. Counts 13 to 15 may be among the counts on which Symington is retried; count 11 may not. The mistried counts were properly dismissed without prejudice for violation of the Speedy Trial Act.

FITZGERALD, Senior District Judge, Concurring in part, dissenting in part.

I respectfully dissent with respect to Part II of the majority opinion.

The opinion holds that "if the record evidence discloses any *reasonable* possibility that *the* impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." (second emphasis added). The opinion then rejects the trial judge's findings respecting Juror Cotey, focuses on two isolated comments from the jurors, speculates as to their meaning, and concludes that Juror Cotey's views on the merits of the case provided *the* impetus for her removal. Although I agree with the standard the opinion has established, in my view, the record does not support the opinion's conclusion with respect to that standard.

The record reveals that on August 19, 1997, the trial court convened a meeting in chambers with Mr. Schindler and Mr. Dowd, the attorneys for the government and defendant, to discuss a note from the jury, which read:

> We, the jury, respectfully request that this information be kept confidential.

> We have earnestly attempted to follow your last directive to continue with our deliberations. However, the majority of the jurors sincerely feel that the juror in question cannot properly participate in the discussion with us.[1]

**11.** We reject the government's attempt to distinguish *Tertrou* on the grounds that the post-trial motion in that case involved mistried counts, whereas Symington's post-trial motion related to counts on which he had been convicted. We find no indication in *Tertrou* that its holding ought to be so limited. Moreover, if the factual distinction between *Tertrou* and this case is of any consequence, it supports Symington's position. *Tertrou* held that even though the post-trial motion involved the same claims to which the Speedy Trial Act applied, the pendency of the motion did not toll the 70–day clock except as provided in § 3161(h)(1)(J). Here, the relationship between Symington's post-trial motion and the

mistried counts is more attenuated, since the post-trial motion did not involve the mistried counts. If the pendency of a motion involving the very claims to which the Speedy Trial Act applies cannot toll the 70–day clock, there is no justification for tolling the clock while a less closely related motion is pending.

**12.** Because we reverse Symington's conviction and vacate his sentence on this ground, we do not reach the other issues raised by Symington and the government on appeal.

**1.** Although Juror Cotey was not identified as the "juror in question," her identity is obvious at this point in the proceedings.

Reasons: Inability to maintain a focus on the subject of discussion.

Refusal to discuss views with other jurors.

All information must be repeated two to three times to be understood, discussed, or voted on. Immediately following a vote, the juror cannot tell us what was voted.

We question the ability to comprehend and focus on the information discussed.

This is the same juror of our last communication.[2]

We have carefully read the instructions from the Court and we feel that page 68, paragraph 3, addresses our concerns.[3]

Bill Carlson, foreperson.

The jury note indicated that the jury had earnestly attempted to continue deliberations in accordance with the trial court's instructions in response to the previous note. However, the majority of the jurors now were of the opinion that one of their members could not properly participate in deliberations.

The trial court and attorneys agreed that it was necessary for the court to make a determination on whether Juror Cotey was incompetent or simply refused to deliberate according to the court's jury instructions. Accordingly, Presiding Juror Carlson, was summoned to chambers. Prior to questioning Juror Carlson, the trial court carefully stated:

[A]t the outset, let me make one thing clear. As we discuss whatever we discuss, one thing we don't want to know is anything about how the jury stands on any of the substantive issues that are presented to you. So it's important that you not discuss in any sense or reveal in any way to us how the jury is proceeding substantively with the issues that are before you for your consideration. But we, of course, need to discuss with you the matters that you raised in your communication.

Juror Carlson was then asked if Juror Cotey was *unable or unwilling* to accomplish her responsibilities as a juror, and he responded that Juror Cotey's *ability*, not willingness, was the problem. Juror Carlson stated further that Juror Cotey never seemed to pay attention and that fellow jurors were suspicious of her problems with concentration, memory, and other abilities. Juror Carlson explained that Juror Cotey would enter into rambling discourses, was unable to remember what had just been discussed, and would give answers unrelated to questions asked of her. Juror Carlson also stated that the prob-

---

**2.** The jury had previously sent a note to the trial judge stating: "Your Honor, we respectfully request direction. One juror has stated their final opinion prior to review of all counts." The trial court, after consultation with the attorneys, reminded the jury of its duty to deliberate. The wording of the trial judge's response to the jury is nearly identical to instruction 7.1 of the Ninth Circuit Manual of Model Criminal Jury Instructions. The instruction was also found at page 68 of the jury instructions given in this case.

**3.** An objective and careful analysis of the August 19 note discloses that the jury was concerned with the ability of Juror Cotey to comprehend and focus on the issues before the jury. The concern with Juror Cotey's ability arose from her conduct in the course of deliberations. The case now before us may be distinguished from *United States v. Brown*, 823 F.2d 591 (D.C.Cir.1987). In *Brown*, the court received a note from a juror in which the juror indicated he could not discharge his duties as a juror. Upon inquiry by the court, the juror disclosed that he could not agree with the way the RICO conspiracy act reads. The court discharged the juror on finding that he could not follow the law and thus could not discharge his duty as a juror. On appeal, the D.C. Circuit concluded that dismissal of the juror stemmed from the juror's view on the sufficiency of the evidence offered by the government at trial and the juror should not have been dismissed. In the present case, the trial judge acknowledged that no juror should yield a thoughtfully held position simply to arrive at a verdict, but dismissed Juror Cotey because she was unwilling or unable to deliberate with her colleagues. In other words, Juror Cotey was not dismissed because of her views about the evidence, but because she was unwilling or unable to participate in deliberations.

lems happened repeatedly, despite the jurors' efforts to explain to Juror Cotey exactly what they were discussing.

When asked by defense counsel Dowd if the problems occurred because Juror Cotey had rendered final opinion and was not going to cooperate anymore, Juror Carlson responded that it was "hard to say" but that the jury had tried to share information openly and Juror Cotey's statements "made no sense." Juror Carlson added that the jury tried to focus on deliberating, but it wasn't "functioning that way" and that he wondered if Juror Cotey wasn't "too old to keep up."

Government counsel Schindler then stated: "Just so it's clear, the answers that you got back seemed to not make sense even to the question or what was going on in this note?" Juror Carlson responded: "Correct. And that was our concern." The court then asked: "Your perception of the reason is not that [Juror Cotey] has made up ... her mind and just doesn't want to talk about it further, but is something else, would you say?" Juror Carlson responded: "Yes," and then again described Juror Cotey's rambling, "off the wall," participation in discussions.

Juror Carlson was excused and the trial court and attorneys discussed whether they should speak with Juror Cotey. Mr. Dowd stated that she appeared cogent and coherent during voir dire. The judge's law clerks then informed the judge that Juror Cotey needed assistance from another juror when asked to return a copy of an exhibit, was confused as to whether she was an alternate or regular juror, and needed help completing the lunch menu. After further discussion, the trial court elected to speak with Juror Cotey.

Juror Cotey was then brought into the judge's chambers and questioned. The governments' attorney found her answers non sequiturs and suggested that she be excused. Defense counsel, however, disagreed, saying that Juror Cotey answered the questions well. The court then agreed to question the remaining jurors.[4]

Juror Tejada stated that Juror Cotey would ask questions unrelated to the discussion, would be uncertain about which count they were discussing, would go off on tangents unrelated to the discussion, and would mumble about "something else" and go "off on her own." Juror Tejada also explained that Juror Cotey displayed an inability to recall topics currently under discussion, but would remember topics discussed the previous week.

Juror Witter stated that one juror began to explain to Juror Cotey everything that was happening, that Juror Cotey had a lot of questions, and that the jurors had to refresh her memory. Juror Witter stated further that after Juror Cotey would vote on an issue she would say she was "bullied" and it wasn't her vote and that although Juror Cotey said that "her mind was made up," she often changed her mind after voting. The trial judge asked Juror Witter if there was anything the court might do to help alleviate this difficulty. Juror Witter responded:

> Well, I said there's probably the only things we can do and that would be completely go through the process like you instructed us to, but I do know what the outcome is going to be, other than a few items that we—we do mutually agree upon. And that would be an undecided vote, a hung jury or I don't know—if there was a replacement person that can come in, I don't know the process of how that works.

Government counsel Schindler suggested that the trial court might inquire if Juror Witter agreed with the note and if the note was an accurate description from Juror Witter's perspective. Juror Witter responded: "Yes, I do."

Juror Smith testified that Juror Cotey wandered off looking for exhibits or testi-

---

**4.** Each juror, including Juror Cotey, was carefully admonished not to discuss the merits of the case nor any of the juror's positions on the case, but to confine their comments to issues raised in the note.

mony from someone that was unrelated to the count under discussion. Juror Smith stated that after one vote had been taken, Juror Cotey was asked if she understood what had just occurred, and Juror Cotey said "yes." She was then asked if she knew what she had voted on, and said "no." Juror Smith stated several times that Juror Cotey did not understand what the jury was doing. When asked by the judge if it was an issue of Juror Cotey's ability or willingness to deliberate, Juror Smith stated that it involved her ability.

Juror Seaman testified that Juror Cotey would wander off the topic and alluded to things that had nothing to do with the discussion. Juror Seaman stated that Juror Cotey did not understand the evidence and needed to have another juror explain things to her after an issue had already been discussed. Juror Seaman stated that Juror Cotey would frequently "drift off" and would refuse to discuss her views.

Juror Streeter testified that Juror Cotey refused to discuss her views and was unable to put her views into words. Juror Streeter also testified that Juror Cotey could not focus on the subject under discussion, could not recall the topic under discussion, and would ask questions about different topics than the one under discussion. Juror Streeter stated that many of the jurors felt that Juror Cotey was unable to comprehend what they were doing. Juror Streeter stated further that Juror Cotey had taken a position on the counts before they had been discussed.

Juror Thompson stated that Juror Cotey was not attentive and could not really talk about the subject at issue. Juror Thompson stated further that Juror Cotey would say things that had no meaning to the subject they were discussing and that it seemed like she was not comprehending what the jury was talking about or doing. Juror Thompson also stated that everything needed to be explained to Juror Cotey three or four times.

Juror Robinson stated that Juror Cotey was unable to comprehend, could not follow along, and her comments had "nothing

whatsoever" to do with the subject matter under discussion. Juror Robinson stated further that Juror Cotey didn't seem to have any idea of what the jury was doing. Juror Robinson also stated that they tried to help Juror Cotey "individually in detail" and that Juror Cotey did not want to participate. When asked if Juror Cotey behaved in the described manner because she had reviewed all the evidence and come to a decision, Juror Robinson stated "No, that isn't the case at all ... she certainly has not reviewed all the evidence."

Juror Pettes stated that the jury note in question was "pretty accurate" because Juror Cotey didn't know what was being discussed even if it was explained two or three times. Juror Pettes stated further that in the beginning, Juror Cotey did not know the difference between the indictment and the instructions. When asked if Juror Cotey's problems involved a willingness to deliberate or ability to deliberate, Juror Pettes stated that Juror Cotey was not comprehending everything and made decisions without reasons to support them. Juror Pettes said it was "scary" when, after going over something several times and voting, Juror Cotey could not say what they had just voted on.

Juror Hartle stated that he agreed with what was in the note. Juror Hartle stated further that Juror Cotey did not concentrate on the issues, was not aware of what count was under consideration, and could not say what issue had just been voted on. Juror Hartle felt that Juror Cotey wasn't consistent, changed her mind, and did not comprehend what was happening.

Juror Bamond stated that Juror Cotey had "tangents off line," asked what the jury was talking about after a discussion was completed, and expressed "philosophies that go straight out somewhere in left field." Juror Bamond stated further that Juror Cotey was unsure of what had been voted on and what count was being discussed. Juror Bamond also intimated that after a vote Juror Cotey would say "I

didn't vote that way." Juror Bamond thought Juror Cotey was trying to "change the system," and that Juror Cotey, bothered the jury with "stupid points that don't make any sense." Juror Bamond stated that Juror Cotey "doesn't comprehend sometimes, doesn't know where we are sometimes." Juror Bamond stated that after discussing evidence for hours, Juror Cotey would say, "What document is that? Where did you see that?," and the discussion would start all over.

After the final juror appeared, the trial judge heard arguments by the attorneys. Mr. Schindler argued that Juror Cotey's fellow jurors all said that Juror Cotey was unable to comprehend and affirmed that the contents of the note were accurate. He argued that Juror Cotey did not have an honestly-held belief; rather, she "flip-flopped and doesn't recall what she voted or votes and then switches her mind." Finally, he argued that jurors consistently described Juror Cotey as a person who doesn't "quite get it."

Mr. Dowd argued that Juror Cotey was a lucid and coherent juror who had reached a conclusion that the other jurors didn't like. Mr. Dowd also argued that Juror Cotey did comprehend and perhaps comprehended more quickly than the other jurors. Mr. Dowd argued further that Juror Cotey may have been a "pain in the neck" but that she was entitled to ask questions.

The trial court then made findings, and in so doing, noted that Juror Cotey's responses to the court's questions "were not truly responsive to the question asked, which in some respects corroborated some of the comments of the presiding juror." The court observed that all jurors concurred in the note sent by the presiding judge. The trial judge found that:

> Juror [Cotey] is either unwilling or unable to deliberate with her colleagues. More specifically, the facts upon which the Court makes that finding are the comments of the other 11 jurors, none of whom report any acrimony or personal difficulties with Juror [Cotey], but all of

whom confirm what appears to them to be either an unwillingness or an inability to join with them in deliberations in accordance with the Court's instructions, specifically that is to jointly review the evidence and to confer with colleagues concerning the evidence in an effort to reach their decisions.

> It is, or course, the very essence of the jury process that jurors not only may hold differing views, but are instructed to form their views and opinions and to not waiver from them if they are held after engaging in thoughtful deliberation.

> It is indeed the safeguard of the jury system that there are 12 independent views. And the instructions direct and, of course, it is fundamental that no juror should yield a thoughtfully-held position simply to arrive at a verdict. But there has been nothing stated by any of the jurors that would indicate that that is the situation here.

> The Court and counsel were mindful of that problem and I hope were—I hope the Court was appropriate in trying to assure that was not that Juror [Cotey] had a differing view that was her opinion after considering the evidence and that she was, as instructed, simply not yielding that view. But when inquiry went to that subject, it was the report of her fellow jurors that that was not the issue, but that instead, she would not participate in the process.

> Beyond that which would tend to indicate an unwillingness to deliberate, and the Court does not make that finding. As indicated earlier, it's either an unwillingness or an inability to deliberate. And it's unclear to the Court as to what that cause might be. But virtually without exception, the other jurors reported that she was unable to follow the discussions, was apparently having an inability to comprehend the topic then under discussion, was not participating in the discussion process, was lacking in concentration and awareness, was apparently

unable to follow the discussion, would raise matters that by their subject matter appeared to not relate to the topic under discussion.

It is not lightly that the Court comes to this conclusion, but it comes to it because it believes that the evidence is clear in directing the finding that it has made. Accordingly, the court will excuse Juror [Cotey] ... for just cause for being either unwilling or unable to participate in the deliberative process in accordance with the instructions of the court.

The trial court's findings focus exclusively on Juror Cotey's ability to function as a juror, and several times the trial court specifically states the Juror Cotey's dismissal is *not* based on her position on the merits. In fact, nothing in the findings alludes to Juror Cotey's position on the merits of the case, and nothing in the findings suggests that *the* impetus for Juror Cotey's removal came from her position on the merits. The trial court's findings are fully supported by the record made with the jurors' interviews.

Nevertheless, the opinion finds that "there was considerable evidence to suggest that the other jurors' frustration with [Juror Cotey] derived primarily from the fact that she held a position opposite to theirs on the merits of the case." If such "considerable evidence" exists, the opinion fails to disclose it. Rather, from the one hundred one pages of transcripts on the issue, the opinion cites two partial sentences from two of the jurors. The opinion states that Juror Witter "asked the district judge to dismiss [Juror] Cotey" to avoid a hung jury, but a fair reading of the transcripts, which I quoted above, reveals that Juror Witter made no such specific request. The opinion has taken Juror Witter's comment out of context, and ignored the bulk of Witter's testimony which supports the trial judge's ultimate decision. The opinion also references Juror Bamond's comment that because of Juror Cotey, the jury was "blocked and blocked and blocked." Juror Bamond's partial statement, however, is subject to various interpretations, such as the jury was blocked from deliberating, or blocked from considering other counts, or blocked from voting on counts. It is pure conjecture to suggest that the statement means that the jury wanted Juror Cotey dismissed because of her position on the merits. In view of the extensive record and the trial judge's findings, these isolated statements simply fail to establish any reasonable possibility that *the* impetus for Juror Cotey's dismissal stemmed from her views on the merits of the case. Rather, to reach such a conclusion requires speculation.

The opinion also refers to a statement by Juror Cotey that she "can't agree with the majority all the time, at least temporarily." Whatever that statement means, it could not have been relied upon by the trial judge, unless he considered it as evidence of Juror Cotey's inability to express her views. In short, the three partial statements do not amount to "considerable evidence" that the jurors' frustration with Juror Cotey derived from her position on the merits.

The trial judge, based upon the jurors' interviews and his own observations, found that Juror Cotey could not comprehend the issues, lacked concentration and awareness, was unable to follow discussions, and discussed unrelated issues. In contrast, the opinion, rather than addressing the bulk of the jurors' testimony, simply disregards it, and concludes without support from the record that even though each of the jurors may have *thought* their difficulties did *not* stem from Juror Cotey's position on the merits, *they actually did.* I suggest that the opinion's reasoning rests on speculation and ignores the fact that the trial judge "is in the best position to evaluate the jury's ability to deliberate." *Beard,* 161 F.3d at 1194 (internal quotation marks omitted).

The opinion engages in further speculation when it suggests in footnote 7 that if Juror Cotey had agreed with the other jurors on all points, they would never have noticed her inability to explain her views. This bit of conjecture ignores the jurors'

testimony that at times Juror Cotey did agree with them, but then changed her mind and couldn't explain why. The other jurors' frustration with Juror Cotey would have arisen regardless, because the difficulties stemmed from Juror Cotey's need to have issues explained repeatedly, asking questions unrelated to the topic, asking to review issues repeatedly, and inability to focus on the topic at issue. As the jurors testified and the trial judge found, these problems arose solely from Juror Cotey's inability to comprehend the topics at issue and are completely unrelated to her position on the merits.

The opinion also states in footnote 8 that "because it was reasonably possible that the problems all stemmed from the other jurors' disagreement with [Juror Cotey's] position on the merits, it was error to continue the case without her." Again, this statement ignores the clear weight of the evidence and ignores the trial judge's findings. The statement also ignores the judge's admonition to each juror that they were not to discuss the merits of the case during the interviews. The opinion does, in fact, commend the trial judge for scrupulously avoiding any discussion of the jurors' views on the merits when he interviewed them, but then finds a reasonable possibility that *the* impetus for dismissing Juror Cotey stemmed from her views on the merits. Only by second guessing the trial judge and by ignoring his opportunity to evaluate Juror Cotey's ability to deliberate, can the opinion conclude that *the* impetus for dismissing her stemmed from her position on the merits.

The opinion suggests in footnote 5 that "reasonable possibility" may be likened to the standard of "reasonable doubt." Reasonable doubt, as defined in Ninth Circuit Manual of Model Criminal Jury Instruction No. 3.3, is doubt that leaves one "firmly convinced that the defendant is guilty." Thus we must be "firmly convinced" that *the* impetus for dismissing Juror Cotey was her position on the merits. "Reasonable possibility" then, like "reasonable

doubt," must be "based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence." *Id.* Here, a careful consideration of "all of the evidence," coupled with the fact that the trial judge is in the best position to evaluate the jury's ability to deliberate, cannot leave one "firmly convinced" that *the* impetus for dismissing Juror Cotey was her position on the merits. Rather, it is only through speculation, based on a limited portion of the evidence taken out of context, that the opinion reaches its conclusion.

On my review of the record, I conclude that the evidence fails to support the opinion's conclusion that *the* impetus for removing Juror Cotey was her position on the merits. The record is clear and speculation is unnecessary. In light of the overwhelming evidence, the trial judge could not have abused his discretion in dismissing Juror Cotey. *See Beard,* 161 F.3d at 1193.

For these reasons, I respectfully dissent with respect to Part II of the majority opinion.