**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.

HAGOP VARTANIAN,
             *Defendant-Appellant.*

No. 05-10581

D.C. No.
CR-01-05069-OWW

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, District Judge, Presiding

Argued and Submitted
October 18, 2006—San Francisco, California

Filed February 28, 2007

Before: J. Clifford Wallace, Andrew J. Kleinfeld, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

## COUNSEL

Dennis P. Riordan, Esq. and Donald M. Horgan, Esq., Riordan & Horgan, San Francisco, California, for the defendant-appellant.

Mark E. Cullers, Assistant United States Attorney, Fresno, California, for the plaintiff-appellee.

## OPINION

BYBEE, Circuit Judge:

Hagop Vartanian ("Vartanian") appeals his jury convictions for aiding and abetting the filing of a false tax return, in violation of 18 U.S.C. § 2 and 26 U.S.C. § 7206(1), and two counts of aiding and abetting the making of false statements on a loan application, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1014. On appeal, Vartanian asserts that the district court abused its discretion when it dismissed a juror from service.[1] We have jurisdiction under 28 U.S.C. § 1291, and we affirm Vartanian's conviction.

I

In November 2001, a grand jury returned an indictment charging Vartanian with understating the income from his auto sales business, Pacific Sales & Leasing, on his 1994 and 1995 tax returns; with deliberately omitting income from his business, Muscles-N-Motion; and with deliberately omitting income from his illegal bookmaking business. The indictment also charged Vartanian with knowingly making false statements on his 1993 and 1994 tax return for the purpose of obtaining a car loan.

Vartanian's trial began in February 2003, and the jury began deliberations in March 2003. On the second day of deliberations, the trial judge received a note from the jury foreperson stating: "There is one juror that has been seen on different occasions speaking to the defendant's family. Juror's name is Kathy. Three or four people have seen her and two saw her this morning chatting with them outside the courtroom." After discussing the note with counsel for both sides, the judge decided to interview the juror ("Juror 7") to deter-

---

[1] We have addressed Vartanian's claims regarding jury instructions and exclusion of witness testimony in an unpublished disposition.

mine the extent and nature of her contacts with individuals associated with the case.

When questioned about her contacts, Juror 7 stated that she had only exchanged "pleasantries" with people associated with the case, telling them "hi," "it's a nice day," or "[t]hings will be okay." Juror 7 assured the judge she had done nothing more than say hello and did not intend to express her feelings about the case. At that time, Juror 7 also maintained that she made the "[t]hings will be okay" comment to a woman she described merely as dark-haired and present in the courtroom.

After the interview with Juror 7, the judge commented that "[he did]n't have any reason to disbelieve [Juror 7]," but wanted to talk to the foreperson who had raised the initial complaint. Soon after making that comment, however, the judge learned that Juror 7 had spoken to another court official after her interview and informed the official that the woman with dark brown hair was actually Vartanian's sister—a fact she had not stated in her interview.

The trial judge then interviewed the remaining 11 jurors and a person associated with Vartanian whom Juror 7 had approached. In these interviews, the jurors collectively related several instances in which they observed Juror 7's improper contacts: Juror 7 once made a point of taking the elevator alone with people associated with Vartanian's case; Juror 7 deliberately approached Vartanian's family and individuals associated with his case and talked with them for "maybe a minute"; while in Starbucks, Juror 7 initiated conversation with defense counsel, Vartanian, and a few other people associated with Vartanian, though she explained to another juror that she was "just saying hi"; and Juror 7 walked out of the courthouse talking with a blond woman who was present during trial proceedings. One juror added that, while seated at a lunch table, Juror 7 started talking about "Vartanian's eyes and how kind he looked and everything."

Between interviews, defense counsel confirmed that he, Vartanian, and other people associated with Vartanian were ordering coffee, when Juror 7, who was with another juror from the case, called out to them to: "Buy us a coffee too." The judge also interviewed Vartanian's brother's fiancé, a blond woman with whom Juror 7 had been observed speaking, to determine the extent of her contact with Juror 7.

In his interview with each juror, the judge carefully verified that the situation had not affected the juror's ability to remain fair and impartial. Although the trial judge attempted to focus the juror interviews on Juror 7's contact with individuals associated with the case, one breach did occur. During an interview, one juror blurted out that "[Juror 7] said that [Vartanian] was not guilty and nobody can change—" Later, when asked whether Juror 7's conduct "influenced [her] or affected [her] in any way," the same juror also remarked: "Well, I think the jury is going to be hung up."

Following these interviews, the trial judge expressed his concern with Juror 7's behavior. He noted that, at the outset of the case, the jurors were shown a video tape entitled "Called to Serve," which instructed them "not [to] mingle or talk with anyone associated with the case, including the lawyers, the parties, and the witnesses" and not to discuss the case with "other jurors until . . . inside the jury deliberation room." The judge emphasized the fact that when confronted with the allegations, Juror 7 mentioned only one contact and assured the court it was just "casual." However, interviews with the other jurors revealed that Juror 7 had much more extensive contact than she had admitted. The trial judge found that Juror 7 had "not been forthcoming and entirely truthful with the Court" and had "entirely minimized [her contacts]." In addition to the evidence gained through juror interviews, the judge also noted that Juror 7 exhibited other "bizarre" behavior, including "bombard[ing] . . . the parties and the Court with notes asking questions" at inopportune times and bringing chocolates to the court reporter and insisting that she take them.

The trial judge found that Juror 7 "expressed solicitude" and "gave assurances" to family members and persons associated with the defendant. He further found that Juror 7 "was not forthcoming, did not disclose all her contacts, and we had to learn about all these contacts from other jurors." Based on his observation of Juror 7's "demeanor" and "explanations," the judge found that "the juror [had] been deceitful and untruthful with the Court" and was "untrustworthy." The trial judge concluded that he was "unwilling to trust [Juror 7] to be a fair and impartial juror" and dismissed her from service.

After two more days of deliberation, the jury found Vartanian guilty on all counts. The court pronounced judgment and sentenced Vartanian to fifteen months in prison and ordered payment of a $10,000 fine. Vartanian filed a timely appeal to this court.

## II

**[1]** Federal Rule of Criminal Procedure 23(b) provides that "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." FED. R. CRIM. P. 23(b). "Good cause" encompasses a variety of problems that may arise with respect to the jury, including sickness, family emergency, or misconduct. *See, e.g.*, *United States v. Beard*, 161 F.3d 1190, 1192-93 (9th Cir. 1998). Because "the district court [is] in the best position to evaluate the jury's ability to deliberate," we generally defer to the district court's good cause determinations. *Id.* at 1194 (internal quotation marks omitted); *see also United States v. Ross*, 886 F.2d 264, 266 (9th Cir. 1989). We review a district court's dismissal of a juror during deliberations for abuse of discretion and the district court's factual findings relating to the issue of juror misconduct for clear error. *See United States v. Shryock*, 342 F.3d 948, 973-74 (9th Cir. 2003); *Beard*, 161 F.3d at 1193.

Vartanian asserts that the district court should not have dismissed Juror 7 because so long as there is "any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case," the trial judge must either "send the jury back to continue deliberating or declare a mistrial." *United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999). For reasons we explain below, *Symington* does not govern our disposition here.

**[2]** In *Symington*, the jury complained that one of its members refused to participate in the deliberative process. *Id.* at 1083. The evidence that developed, however, suggested that the jurors' "frustrations with [the reluctant juror] may have derived more from their disagreement with her on the merits of the case." *Id.* at 1084. The issue was what evidentiary standard a district court should use when evaluating the likelihood "that a juror's views on the merits underlies the request for her removal." *Id.* at 1086. We expressed concern that any inquiry " 'would invite trial judges to second-guess and influence the work of the jury,' " and that the district court might expose jury deliberations to public scrutiny, thereby interfering with "the integrity of the deliberative process." *Id.* (quoting *United States v. Thomas*, 116 F.3d 606, 620 (2d Cir. 1997)). In order to preserve these "twin imperatives," we held that if there was "any *reasonable* possibility" that the jurors' complaints stem from the juror's views on the merits then the trial judge has "only two options: send the jury back to continue deliberating or declare a mistrial." *Id.* at 1087. At the same time, we emphasized in *Symington* that "[c]ases subject to this rule . . . are infrequent" and that "[i]n general, questions of juror bias or competence focus on 'some event, or . . . relationship between a juror and party, that is both easily identifiable and subject to investigation and findings without intrusion into the deliberative process.' " *Id.* at n.6 (quoting *Thomas*, 116 F.3d at 621).

**[3]** The impetus for the jurors' complaints about Juror 7 was not her willingness to deliberate, but her misconduct out-

side of the jury deliberation room. The note that the foreperson sent to the trial judge raised issues of improper contacts suggesting juror bias. The district court carefully interviewed all of the jurors and found that Juror 7, in violation of the court's instructions to the jury,[2] had spoken to members of the defendant's family, defense counsel, and apparently even to the defendant himself. Moreover, the trial judge also found that when questioned, the juror had not been forthcoming about all of her contacts. Some of the jurors' complaints were corroborated by defense counsel and the defendant's brother's fiancé. Under these circumstances, the record amply supports the district court's findings that Juror 7 was "untruthful with the Court" and "untrustworthy." It was thus appropriate and well within the district court's discretion to dismiss Juror 7. *See Shryock*, 342 F.3d at 973-74; *Beard*, 161 F.3d at 1193.

**[4]** The only fact that arguably brings this case within *Symington* is that one of the jurors, while being questioned by the district court, volunteered that "[Juror 7] said that [Vartanian] was not guilty and nobody can change—" and "I think the jury is going to be hung up." These statements, which were not solicited by the trial court, should not have been volunteered and could not be a basis for removing the juror. Nevertheless, we think that the district court properly ignored them. Juror 7 was dismissed because of her misconduct and not because of her views on the merits. This case thus evokes none of the concerns we cited in *Symington*. The judge had no occasion to—and did not—inquire into the jurors' motivations for reporting the misconduct or the course of the jury's deliberations. Juror 7's conduct under investigation was

---

[2]Vartanian argues that Juror 7's contacts were not contrary to any instructions given by the court. The record, however, reflects that the trial judge admonished the jury on numerous occasions not to discuss the case with individuals associated with the parties or anyone else and showed the jurors a video tape that instructed them "not [to] mingle or talk with anyone associated with the case, including the lawyers, the parties, and the witnesses" and not to discuss the case with "other jurors until . . . inside the jury deliberation room."

behavior outside of the jury deliberation room. Since the "questions of juror bias or competence" raised here "focus on 'some event, or . . . relationship between a juror and party, that is both easily identifiable and subject to investigation and findings without intrusion into the deliberative process,' " the "rule we announce[d in *Symington*] is not triggered." *Symington*, 195 F.3d at 1087 n.6 (quoting *Thomas*, 116 F.3d at 621).

## III

**[5]** For the foregoing reasons, the district court did not abuse its discretion when it excused Juror 7 under Rule 23(b). We affirm Vartanian's conviction.

**AFFIRMED.**