**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

BRETT DEPUE,
*Defendant-Appellant.*

No. 15-10553

D.C. No.
2:10-cr-00121-
RLH-RJJ-1

OPINION

Appeal from the United States District Court
for the District of Nevada
Roger L. Hunt, Senior District Judge, Presiding

Argued and Submitted October 16, 2017
San Francisco, California

Filed January 11, 2018

Before: Richard C. Tallman and Consuelo M. Callahan,
Circuit Judges, and David A. Ezra,[*] District Judge.

Opinion by Judge Callahan

---

[*] The Honorable David A. Ezra, United States District Judge for the
District of Hawaii, sitting by designation.

## SUMMARY[**]

### Criminal Law

Affirming the defendant's convictions and sentence for fraud and conspiracy in connection with a mortgage fraud scheme, the panel held that a trial judge may excuse a juror at any time for any material problem impeding fair deliberations as long as it was not due to the juror's views of the merits of the case, and that the defendant cannot show plain error at sentencing because he affirmatively waived his right to challenge the alleged Guidelines errors.

### COUNSEL

Mario Valencia (argued), Henderson, Nevada, for Defendant-Appellant.

Adam Flake (argued), Assistant United States Attorney; Elizabeth O. White, Appellate Chief; Steven W. Myhre, Acting United States Attorney; United States Attorney's Office, Las Vegas, Nevada; for Plaintiff-Appellee.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

CALLAHAN, Circuit Judge:

Brett Depue ("Depue") orchestrated a massive mortgage fraud scheme victimizing at least thirty people, depressing housing prices across the Las Vegas region, and causing a total loss in tens of millions of dollars. Depue appeals from his jury convictions of wire fraud and conspiracy to commit bank fraud, mail fraud, and wire fraud; and from the 262-month sentence the district court imposed.

Depue argues that the district court: (1) abused its discretion under the Constitution and the Federal Rules of Criminal Procedure when, amidst deliberations, it dismissed a juror who had complained of being poisoned, possibly by another juror; (2) plainly erred in using the sales prices rather than the loan principals in arriving at the total loss calculation for the purpose of calculating Depue's sentence; and (3) plainly erred in calculating, for United States Sentencing Guidelines ("Guidelines") purposes, the loss amount of just over $25 million from the Government's summary chart allegedly containing some errors.

We hold, first, that a trial judge may excuse a juror at any time for any material problem impeding fair deliberations as long as it was not due to the juror's views of the merits of the case. We also hold Depue has not shown that the district court committed plain error when it considered evidence for Guidelines-based sentencing purposes which the defendant had made no effort to address below.

## I. Factual and Legal Background

Depue operated a number of Nevada businesses such as ABS Investments Group, LLC, and Liberty Group

Investments, LLC. From February 2005 to May 2007, Depue conspired with about fourteen others to defraud federally-insured banks. The conspiracy consisted of recruiting "straw buyers"[1] to purchase homes they had no intention of occupying, which Depue would then control. Depue paid the straw buyers up to $5,000 to buy houses in their names using their credit histories, occasionally purchasing five houses per straw buyer. Sometimes, in order to raise the likelihood that the lenders would lend to the straw buyers, Depue would even put the straw buyers' names on his own bank account. Depue directed his co-conspirators to prepare mortgage applications containing false and fraudulent information about their employment, income, assets, and intent to occupy the property as a primary residence. Using this scheme, Depue and his co-conspirators obtained mortgage loans for 110 homes in Las Vegas and Henderson between April 2005 and April 2007. Through this operation, Depue victimized at least thirty people, and made $14–15 million.

Initially, Depue orchestrated straw-buyer transactions in which the straw buyers purchased properties using 100% financing. The properties were purchased at above asking price, and the difference was disbursed at closing to one of Depue's entities. Then Depue began using "double escrows" in which a middleman purchased a property and soon thereafter resold it to a straw buyer at an inflated price, frequently on the same day. The difference between the price sold to the straw buyer and the middleman purchases were distributed to Depue's company as "seller proceeds." Paperwork made it appear as only one sale, removing

---

[1] "Straw buyers" are individuals who permit residential real estate to be bought in their names to facilitate the acquisition of property and to conceal the identity of the true purchaser from the lenders.

evidence of the middleman. The banks eventually foreclosed on the properties, contributing to the decrease in housing property values across the Las Vegas area. It is estimated that the lending financial institutions lost more than $25 million due to Depue's fraud.

Initially, the Government indicted Depue on twelve counts: wire fraud and aiding and abetting pursuant to 18 U.S.C. §§ 2, 1343, and conspiracy to commit bank fraud, mail fraud, and wire fraud pursuant to 18 U.S.C. § 1349. The Government dismissed four of the counts against Depue during his first trial, which resulted in a mistrial on the remaining eight counts.

In February 2012, Depue's second trial on the remaining eight counts began. Depue chose to proceed pro se. On March 6, 2012, the jury found Depue guilty on all eight counts. Depue appealed his convictions to the Ninth Circuit. In an unpublished opinion, we vacated Depue's convictions and remanded because Depue's waiver of his right to counsel had not been sufficiently knowing and intelligent. *United States v. Depue*, 595 F. App'x. 732 (9th Cir. 2015).

In Depue's third trial, held in July 2015, he again proceeded pro se. Depue called no witnesses and made no opening or closing statements. Depue did not challenge the Government's evidence or question its witnesses. Depue raised no objections whatsoever. Again, Depue was convicted on all eight counts.

## A. Dismissal of Juror No. 9

During the first day of jury deliberations, Juror No. 9 sent a signed note to the trial judge stating: "I feel as though someone in this room has poisoned or drugged either my drink or the food I brought for lunch."

To address this matter, the district judge excused the jury and discussed summoning Juror No. 9 with the Assistant U.S. Attorney and Depue. Depue responded, in three instances: "So as long as [this juror] has enough courage to stand up and do the right thing and to continue his duty, then I'd like to see that. If he is dismissed, then I most definitely want a 12th juror to replace him"; "it seems like the best route, as far as my opinion is, this [juror] just needs to just tough it out, not worry about if he did get poisoned or not, because who knows, and just finish the trial"; and "just tell him, hey, just do your job, man up, you know, if you can handle it and just do what you need to do."

Juror No. 9 was then brought before the judge, who asked him to explain, without violating any confidences about the jury deliberations, why he suspected that one of the other jurors or a court official had poisoned him. Declaring himself to be "the odd man out," Juror No. 9 complained of a pounding in his heart, dizziness, "a slight headache," and stomachache. When pressed for a further explanation, Juror No. 9 said he suspected that "one of the individuals took interest in how much [he] ate," along with the way he had been "feeling" "when [he] came in here."

The trial judge asked whether Juror No. 9 had "order[ed] [his] lunch" through court personnel or "br[ought] [his] lunch." Juror No. 9 said he had brought a canned drink from outside and had obtained two drinks from the court refrigerator, neither of which had been tampered with.

The judge tried to ascertain the timeline. The juror said he had left the jury room at least two or three times prior to lunch in order to address his emphysema issues and to brush his teeth. The district court asked the on-duty Court Security Officer ("CSO"): "Are you aware of any time that others were in there or around his food or drink when he was not

there?"  To this, the CSO responded that "Sir, . . . I can't attest to [Juror No. 9's experiences in the restroom], but, from 8:30 this morning, every juror has been accounted for, either in the [jury] room or in the break room."

Delving into the emphysema symptoms, the judge inquired whether that illness "ever cause[s]" the "conditions" of which the juror complained, namely "the palpitations[,] . . . perspiration[,] [and] dizziness." The juror denied that emphysema causes these symptoms in him, but asserted that "[t]he only thing I feel it causes is . . . having to expel phlegm."

The judge then asked whether the juror "feel[s] that [he] can continue as a juror in this case."  The juror commented that "[he], at this point, do[es] not trust someone . . . in that jury room . . ."  The judge then asked Juror No. 9 whether "[he] can participate in deliberations if there's somebody in that group that [he] can't trust."  The juror answered: "Not— not especially, no."

Explaining that it would be improper to "have [the juror] attempt to continue to serve . . . under the circumstances," the judge then excused Juror No. 9.  The judge also arranged for the juror's medical checkup.  The judge then instructed the CSO to facilitate Juror No. 9's departure and to ensure the medical checkup occurred.

Depue objected to the juror's dismissal.  Depue stated he wanted a full complement of twelve jurors to adjudicate the questions attending his culpability and that he also wanted "[Juror No. 9] . . . to stay on the jury."  Depue asserted that "if [Juror No. 9] really is the only holdout, rather than allowing another person to poison and remove him because he's a dissenter," he ought to be retained.  In response, the judge commented that "we only have his feeling that he's the

holdout or that he is a holdout" and "I'm not confident that [the juror is] the only holdout in the jury." The judge continued: "[I]t would be patently unfair to force [the juror] to continue and it would jeopardize the efficacy of a jury verdict." The judge opined that such a course of action "could . . . impair [the juror's] health even more, or force him to capitulate . . ." Depue then stated that there was a connection between the alleged poisoning of Juror No. 9 and the poisoning Depue himself had suffered "many, many, many times over the three and a half years" he spent in prison. The judge commented that he lacked "any evidence of [this accusation,]" and declined to consider this matter.

The judge brought the jury back to the courtroom and notified the jurors that Juror No. 9 had been excused. The judge cautioned that the jury was "not to speculate about anything beyond" the juror's health concern, announced that the alternate juror would replace Juror No. 9, and instructed the jury to restart deliberations from the beginning. The following court day, the newly-constituted jury resumed deliberations. That same day, the jury convicted Depue on all eight counts.

B. Calculation of the Loss Amount During Sentencing

Depue's sentencing hearing took place on November 9, 2015. In its Sentencing Memorandum ("SM"), the Government calculated the total offense level as 39, based in large part on a determination of loss greater than $25 million. U.S.S.G. § 2B1.1(b)(1)(L).

Depue's criminal history category was I. The Guidelines provide that for loss greater than $25 million, the court will add 22 offense levels to the base offense level. *See* U.S.S.G.

§ 2B1.1(b)(1)(L).[2]   The Government submitted evidence that the total sales price for the properties in Depue's mortgage-fraud ring was $55,070,000; the sale from foreclosure was $29,581,950; and, as a result, the total loss was $25,488,050.   U.S.S.G.   § 2B1.1(b)(1)(L).   The Government increased the number of properties Depue had used, from 102 (the number it alleged during the second trial) to 106 in its SM following the third trial.   The Government asserted that "[t]he vast majority of these properties were purchased with 100% financing, and were foreclosed," and that "[t]he unpaid principal on these loans was approximately equal to the original loan amounts, which with 100% financing, also equaled the straw buyer's purchase price."   Therefore, the Government took the total sales price to be roughly equivalent to the aggregated principal loan amounts.   The Government asserted that since the total loss exceeded $25 million, under U.S.S.G. § 2B1.1(b)(1)(L) a 22-level enhancement was appropriate. The Government recommended the lower-end sentence of 262 months, the same sentence imposed on Depue following his second trial.

Depue did not object to the Pre-Sentence Report's ("PSR"), the SM's or the district court's range calculation method or result.  The trial judge asked Depue if there were any errors in the PSR.  Depue mentioned only his qualms about the dates of incarceration.  The trial judge gave Depue a second opportunity to object at sentencing, but Depue did not object.

---

[2] A district court properly begins "sentencing proceedings by [attempting to] correctly calculat[e] the applicable Guidelines range." *Peugh v. United States*, 133 S.Ct. 2072, 2080 (2013) (citation and internal quotation marks omitted).

The district court imposed concurrent terms of imprisonment: 262 months on Count One; 240 months, each, on Counts Two, Three, Four, Five, Six, Seven, and Ten. The district court imposed restitution in the amount of $1,567,429.93, five years' supervised release, and an $800 assessment fee. Depue filed a timely notice of appeal.

## II.  Standards of Review

A district court's dismissal of a juror during deliberations is reviewed for abuse of discretion, and a district court's factual findings relating to the issue of juror misconduct are reviewed for clear error. *United States v. Vartanian*, 476 F.3d 1095, 1098 (9th Cir. 2007).

When a defendant fails to timely object to the district court's calculation of a sentence, we review for plain error. *United States v. Hammons*, 558 F.3d 1100, 1103 (9th Cir. 2009). "Plain error is (1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* (citations and internal quotation marks omitted); *see also United States v. Olano*, 507 U.S. 725, 732–35 (1993). "If these three conditions are met, the court may then exercise its discretion to grant relief if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Hammons*, 558 F.3d at 1103 (citations and internal quotation marks omitted). Finally, on plain-error review, the defendant carries the burden of showing a reasonable probability that, but for the error, he would have received a lesser sentence. *United States v. Joseph*, 716 F.3d 1273, 1280 (9th Cir. 2013).

## III.  Discussion

### A.  Juror Dismissal

The question is whether, under the Sixth Amendment and Federal Rule of Criminal Procedure ("Fed. R. Crim. P.") 23(b)(3), a district court abuses its discretion when it dismisses a juror who might be a hold-out for reasons not stemming from the juror's views on the merits of the case. We hold that a district court does not, under those circumstances, abuse its discretion.

The Sixth Amendment provides, in salient part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  The Amendment prevents a district court from depriving a criminal defendant of the right to "an impartial jury drawn from a fair cross-section of the community."  *Taylor v. Louisiana*, 419 U.S. 522, 535–36 (1975); *see also Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (stating that "the jury must stand impartial and indifferent" to assess the criminal defendant's culpability).  Historically, the right to be tried by one's impartial peers has protected criminal defendants "'against a spirit of oppression and tyranny on the part of rulers,' and 'was . . . the great bulwark of their civil and political liberties.'"  *United States v. Gaudin*, 515 U.S. 506, 510–11 (1995) (quoting 2 J. Story, Commentaries on the Constitution of the United States 540–41 (4th ed. 1873)).  Thus, the Sixth Amendment would become ineffective if, in order to shift a verdict, a trial judge could tinker with the jury's composition.

Fed. R. Crim. P. 23(b)(3) enables a district court to dismiss a juror during deliberations for "good cause."  Good cause includes: a juror's "physical incapacity," *Murray v.*

*Laborers Union Local No. 324*, 55 F.3d 1445, 1452 (9th Cir. 1995), *cert. denied*, 517 U.S. 1219 (1996); a juror's untruthfulness or "misconduct," including "violation[s] of the court's instructions to the jury," *Vartanian*, 476 F.3d at 1098–99; and a juror's "[inability] to deliberate impartially." *United States v. Symington*, 195 F.3d 1080, 1085 (9th Cir. 1999). But good cause broadly "embraces all kinds of problems—temporary as well as those of long duration— that may befall a juror during jury deliberations." *Murray*, 55 F.3d at 1452 (citation and internal quotation marks omitted).

Generally, "[t]he decision to excuse a juror is committed to the district court's discretion." *United States v. Christensen*, 828 F.3d 763, 806 (9th Cir. 2015) (citations and internal quotation marks omitted). Should a problem with a juror arise after deliberations have commenced, the "trial court [must] determine[] the circumstances of what transpired, the impact on the jurors, and whether or not the [problem was] prejudicial." *Bell v. Uribe*, 748 F.3d 857, 867 (9th Cir. 2014). But "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." *Symington*, 195 F.3d at 1087. Trial judges remain empowered with the necessary authority to handle "special challenges" concerning juror dismissal. *Id.* at 1086. They are not obligated to spell out the reasons they excuse a juror because we review judgments, not the reasons guiding the courts below. *California v. Rooney*, 483 U.S. 307, 311 (1987).

We uphold the dismissal because Juror No. 9 was removed for reasons other than his views on the merits of the case. Specifically, Juror No. 9 was removed because: he said he was physically unwell; he said that he could not serve

with his fellow jurors; he said he did not trust "someone" in the jury room; and/or he made conclusory allegations against them. Juror No. 9's views on the case played no part in the district court's decision to dismiss him. Although Juror No. 9 declared that he was "the odd man out," the trial judge ignored this remark and continued to question Juror No. 9 as to his ability to serve as a juror. The court later observed that it had only Juror No. 9's assertion that he was the "odd man out" and that there might well be more than one hold-out juror. Consequently, this case presents a type of "physical incapacity" or "all kinds of [juror] problems" allowing for juror dismissal. *Murray*, 55 F.3d at 1452.

The district court sensitively probed Juror No. 9's poisoning allegation by questioning him about the sequence of events, whether the medical symptoms he said he was experiencing may have been caused by his emphysema, and the circumstances under which the alleged vandalism to his bike took place. The trial judge could not have "delve[d] [any] deep[er] into [Juror No. 9's] motivations" without impermissibly "intrud[ing] on the secrecy of the jury's deliberations" and "jeopardiz[ing] the integrity of the deliberative process." *Symington*, 195 F.3d at 1086 (citations and internal quotation marks omitted).

Moreover, a trial judge is charged with maintaining the courtroom's dignity as well as managing the expeditious flow of voluminous information, motions, evidence, and actors. In this case, Juror No. 9's allegations did not reflect favorably on his mental state. The trial judge spared him, the parties, and the court the indignity and expense of investigating his mental state.

The district court carefully investigated Juror No. 9's fitness to continue to serve as a juror, and its conclusion that he was unfit was not an abuse of discretion.

## B. Calculation of the Loss Amount for
Guidelines-Based Sentencing

Because Depue did not object to any alleged Guidelines errors during his trial or sentencing, the question whether the district court erred in calculating the total offense level is subject to plain-error review.  Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). An error is plain if the criminal defendant shows each of the following: he did not waive his right to challenge an alleged mistake at trial or sentencing; this mistake was clear; it affected his substantial rights; and leaving the error uncorrected will undermine the fairness, integrity and public reputation of judicial proceedings.  *Puckett v. United States*, 556 U.S. 129, 135 (2009).

The first prong is that the defendant must not have "intentionally relinquished or abandoned" his claim. *Molina-Martinez v. United States*, 136 S.Ct. 1338, 1343 (2016) (citing *Olano*, 507 U.S. at 732–33).  Before the district court, Depue said that his only problems with the PSR concerned the incarceration dates, which means Depue affirmatively waived his right to challenge the PSR's computations.  Depue even called the computations "correct" and "accurate."  Furthermore, Depue did not avail himself of the second opportunity to object that the district court gave him.  Because Depue affirmatively waived his right to challenge the alleged Guidelines errors, he fails to satisfy the first prong of the plain-error analysis. Accordingly, Depue cannot satisfy the plain-error standard.

## IV.  Conclusion

The district court did not abuse its discretion under the Sixth Amendment and the Federal Rules of Criminal

Procedure when it removed Juror No. 9 because it reasonably determined he was unfit to continue to serve as a juror for reasons that were unrelated to his views on the merits of this case.  Also, Depue cannot show plain error in the district court's calculation of the total offense level because he affirmatively waived his right to challenge the alleged Guidelines errors.

Depue's convictions and sentence are **AFFIRMED.**