NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

VICTOR TED HERNANDEZ, *Appellant.*

Nos. 1 CA-CR 19-0646, 1 CA-CR 20-0526
(Consolidated)
FILED 8-11-2022

Appeal from the Superior Court in Maricopa County
No.  CR2010-137021-001
The Honorable Erin O'Brien Otis, Judge *(Retired)*
The Honorable Patricia Ann Starr, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Andrew Stuart Reilly
*Counsel for Appellee*

The Susser Law Firm, PLLC, Chandler
By Adam M. Susser
*Counsel for Appellant*

## MEMORANDUM DECISION

Presiding Judge Samuel A. Thumma delivered the decision of the Court, in which Judge Cynthia J. Bailey and Vice Chief Judge David B. Gass joined.

**T H U M M A**, Judge:

¶1    Defendant Victor Ted Hernandez appeals his first degree murder conviction and resulting sentence to natural life in prison. Because Hernandez has shown no reversible error, his conviction and sentence are affirmed.

## FACTS AND PROCEDURAL HISTORY

¶2    On February 19, 2010, T.L.'s[1] lifeless body was found burning at the intersection of Baseline and Rooks Roads in Buckeye, Arizona. An autopsy showed that T.L. had been shot seven or eight times with at least two different guns, before his body was set on fire. Police interviewed B.N., who later provided eyewitness testimony identifying Hernandez, also known as "Lil Chico." B.N. and B.A., T.L.'s girlfriend, provided trial testimony about what happened the day of the murder.

¶3    When B.A. and her sister picked T.L. up from work the day he was killed, she recalled T.L. "was acting odd. He was in a rush to leave." On the ride home, T.L. took several calls, which left him "upset" and he asked B.A. to drop him off at a restaurant because "[h]e was going to fight someone." B.A. took T.L. to the restaurant. Before he got out of the car, T.L. gave B.A. his wallet, watch and phone and told her that if he did not "come back then I could worry." T.L. walked toward a white Chrysler 300, which police later identified as belonging to Hernandez, and got in the backseat. B.A. wrote down the license plate, which she later provided to the police.

¶4    B.N. testified that, on the day of the murder, he was living in a back house in Avondale when he heard a car and saw three visitors, Hernandez, T.L. and "Eddie Boy," none of whom he had expected. The four went into the two-room back house. Hernandez then asked to speak with B.N. and "[w]e go outside. He asking me, he wanted to kill this dude, you

---

[1] Pseudonyms are used to protect identities. *State v. Ewer*, 250 Ariz. 561, 565 ¶ 2 n.1 (App. 2021).

know, straight up. And I was shocked." B.N. testified that Hernandez specifically asked if Hernandez could "smoke him."

¶5            B.N. testified he tried to talk Hernandez out of it and was "scared" and "worried." Hernandez and B.N. went back into the house and B.N. "tried to talk . . . to take the tension away." B.N., who had been doing yard work, went into the other room to change clothes. As he changed, B.N. heard two or three gunshots from the other room. B.N. went back to the other room to see T.L. "falling down, Chico shooting him. He falls down." B.N. testified: "I remember seeing [T.L.] running towards Chico, Chico shooting him in the face, just shooting him, and he falls down towards Chico. Falls down on the side. Chico bending down shooting him. Stopped him, had a little cuss – little cuss words. And he turns around, starts speaking – ignoring me, start speaking to Eddie Boy." B.N. testified Hernandez asked Eddie Boy if he was mad, not to worry and he would clean it up.

¶6            T.L. then "started rushing towards the door" where B.N. was standing. B.N. ran to close the door and heard two more louder gunshots. B.N. then went to the back house and found T.L. in a "puddle of blood" and Hernandez holding a different gun. Hernandez told B.N. he would help him with the body. B.N. testified Hernandez reassured Eddie Boy "he would take care of it." Hernandez then told B.N. that "we had to take Eddie Boy out of there, that Eddie Boy couldn't be there." When they tried to leave, B.N. "took off in the car with them, jumped in the back seat." Hernandez and B.N. then dropped Eddie Boy at his house and went to several stores where Hernandez bought cleaning supplies.

¶7            B.N. and Hernandez went back and cleaned up the house, Hernandez wrapped T.L.'s body in sheets and duct tape, placed him in the trunk of the Chrysler 300 and continued cleaning. B.N. recalled "Chico picking up a piece of meat from the floor and putting it in his mouth, chewing on it, showed it to me, offered me some, said it tastes good, and was laughing about it."

¶8            B.N. testified that he and Hernandez then drove west to Buckeye. Hernandez then got out of the Chrysler 300, took T.L.'s body out of the trunk, "poured some stuff on it, lit it up on fire, and we took off." The Buckeye Fire Department responded to reports of a brush fire and discovered T.L.'s body. Forensic analysis of the bullets showed the use of at least two different guns. The forensic examiner testified the bullets and jacket suggested a 22-caliber gun and a 40-caliber gun.

¶9          The day after the murder, Hernandez sold the Chrysler 300 on Craigslist. At trial, the buyer testified the Chrysler 300 was listed for $6,000, but was worth about $15,000. Later in 2010, Hernandez was indicted for T.L.'s murder. Nine years of pretrial litigation followed, much of which occurred after the State provided notice of an intent to seek the death penalty, which was later withdrawn. Trial began in March 2019 and lasted 41 days, resulting in a guilty verdict. In November 2019, Hernandez was sentenced to prison for natural life and this timely appeal followed. This court has appellate jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031 and 13-4033 (A) (2022).[2]

## DISCUSSION

¶10          Hernandez raises five issues on appeal, claiming reversible error in: (1) admitting in evidence his rap lyrics and the water-well recordings; (2) instructing the jury on accomplice liability; (3) prosecutorial misconduct by the State; (4) removing Juror 5 for cause during deliberations and (5) denying his motion for new trial. The court addresses these arguments in turn.

## I.     Hernandez Has Shown No Error In Admitting His Rap Lyrics and the Water-Well Recordings.

¶11          In April 2010, while Hernandez was in pretrial custody, deputies confiscated rap lyrics that he had written. Hernandez moved to preclude admission of the lyrics at trial, with the court granting the motion in part but allowing the admission of specific lyrics relevant to the murder, finding they were relevant, "highly probative" and not otherwise excludable. The lyrics Hernandez wrote that the court admitted at trial are:

> Little Chico. Enemies see me coming but there's no escaping.
>
> Murder one I got that kite. This is my life, not a [expletive] rap act.
>
> Phearless Records they try to portray that I sprayed that at your home boy [expletive]. My 40 Cal left him in a puddle of [expletive] and

---

[2] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

then I split to collect my things. I come right back and ate his brains.

I lit that fire.

Enemies turn zombies like in Thriller. It's on me to make it back to the camp. But if I never touch down J. [Hernandez' girlfriend in 2010] gots my back. I want to be at home but I'm stuck in the shu and that the truth.

A. cried. She turned five, asked why daddy is buried alive. This ain't good-bye cuz good-bye is forever. We stick together in this weather because it will get better.

¶12       Hernandez argues the court erred in admitting this evidence, a ruling reviewed for an abuse of discretion. *State v. Salamanca*, 233 Ariz. 292, 294-95 ¶ 8 (App. 2013). "'Because the trial court is in the best position to balance the probative value of the challenged evidence against its potential for unfair prejudice,' it has broad discretion to make that determination." *Id*. at 296 ¶ 17 (citing *State v. Connor*, 215 Ariz. 553, 564 ¶ 39 (App. 2007)). On the record presented, Hernandez has shown no error in admitting the evidence.

¶13       Hernandez argues the rap lyrics had little probative value, which was outweighed by their "incalculably and unfairly prejudicial" nature. Hernandez, a prolific rapper, wrote many rap lyrics, but only the one redacted stanza was admitted in evidence, with the court precluding admission of several other of his lyrics. The court found that one redacted stanza was relevant because the lyrics "appear to corroborate the testimony of the State's witness, [B.N.]." The court also found the lyrics were relevant for a proper purpose, "to demonstrate that the author of the rap song lyrics is the Defendant, as the lyrics are reflective of his life and actions." *See* Ariz. R. Evid. 404(b). The court rejected Hernandez' Rule 403 objection, noting the lyrics "may provide highly probative evidence of whether the admissible document constitutes an 'admission of guilt' as to this murder."

¶14       Hernandez argues that "[e]ven assuming *arguendo* that it had some probative value, it was *greatly* outweighed by its danger of unfair prejudice and impermissible character evidence." But the lyrics that were admitted, written by Hernandez after the murder, mention unique aspects of the murder, including the use of a 40-caliber gun, that Hernandez left the victim "in a puddle of [expletive]," and that he came "right back and ate his

brains. I lit that fire." Hernandez has not shown that the court was required to preclude them based on Rule 403 concerns, or that the lyrics were impermissible character evidence under Rule 404(b). *Salamanca* at 296 ¶ 17.

¶15        Hernandez' reliance on a separate opinion in *Jordan v. State*, 212 So. 3d 817, 827 (Miss. 2016) (King, J., objecting) is unavailing. In *Jordan*, a Mississippi Court of Appeals decision affirming defendant's conviction was affirmed where "[f]our of the justices of [the Mississippi Supreme] Court are of the opinion that the judgment of the Court of Appeals should be affirmed, and four are of the opinion that it should be reversed; consequently, that judgment must be, and is, affirmed." *Id*. Justice King, objecting separately, questioned the admissibility of a video containing threatening profanity, in which the defendant was an uncredited extra with no speaking part. *Id.* at 820 ¶ 4. *Jordan* therefore did not involve the defendant's admissions (like Hernandez' rap lyrics here), affirmed a conviction and is not, in any event, binding on this court. Unlike *Jordan*, given the relevance of the lyrics Hernandez wrote and the discretion afforded the court under Rule 403, Hernandez has shown no error in their admission.

¶16        While in pretrial custody, Hernandez was involved in an unrelated prison gang investigation. As part of that investigation, deputies placed recording devices in the jail to "capture the free flowing conversation between inmates that was flowing in the water wells." A water-well is "sort of a hallway" located behind jail cells used for maintenance and housing water pipes.

¶17        During one recorded conversation received in evidence, Hernandez yelled to Eddie Boy in the cell next door that his trial strategy was to convince the jury that there was no premeditation, hoping for a second degree murder conviction. Hernandez unsuccessfully moved to preclude this statement as an unreasonable search and seizure in violation of his Fourth Amendment rights. The court found Hernandez did not have a reasonable expectation of privacy while yelling to someone in the next cell through the water-wells.

¶18        Hernandez argues the recording was prejudicial and obtained in violation of his Fourth Amendment "right to be free from unreasonable searches and seizures" while in pretrial detention. Citing *Hudson v. Palmer*, 468 U.S. 517, 525 (1984), *State v. Jeffers*, 135 Ariz. 404, 413 (1983), *Bell v. Wolfish*, 441 U.S. 520, 546 n. 20 (1979) and *State v. Martinez*, 221 Ariz. 383 (App. 2009), the superior court found Hernandez "ha[d] not established a Fourth Amendment violation because the jail hid recording devices in the

jail vents and water wells, and obtained recorded statements of his communication with other inmates."

**¶19**        "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson*, 468 U.S. at 526. Jail and "[p]rison officials may inspect and examine the communications of inmates without depriving them of their constitutional rights." *State v. Jeffers*, 135 Ariz. 404, 413 (1983). More fundamentally, detainees have no reasonable expectation of privacy when they shout from one cell to the other through water-wells. Thus, Hernandez has not shown his privacy rights were violated.

**¶20**        Claiming the jail had no "internal security" justifications for the recordings, and citing *Grummett v. Rushen*, 779 F.2d 491, 493-94 (9th Cir. 1985)), Hernandez argues the recordings were "*primarily* (if not exclusively) for purposes of learning information about potential criminal activity, not for mere jail security." But the State provided, and the superior court credited, "a legitimate interest in listening to the Defendant's conversations based on the security risk Mexican Mafia members and the Defendant pose to other inmates in the jail," as well as prison guards and visitors. The State also showed that the jail (not the prosecutor) made the decision to surveil Hernandez, which was unrelated to T.L.'s murder.

**¶21**        After weighing the arguments, the superior court found that Hernandez had no reasonable expectation and had not established a Fourth Amendment violation. In doing so, the court considered the State's interest in security, found it to be legitimate and admitted the evidence. On this record, Hernandez has shown no error in admitting the water-well recordings containing Hernandez' own statements. *See Hudson*, 468 U.S. at 526; *Jeffers*, 135 Ariz. at 413.

## II.    The Accomplice Liability Instruction Was Not Erroneous.

**¶22**        In pretrial filings, Hernandez argued he was, at most, an accomplice, claiming "his participation was relatively minor" and that he "was relatively less culpable in light of the participation of others in the offense." Later, the State requested an accomplice liability jury instruction. Hernandez objected, arguing that if the jury found he was an accomplice to B.N., "they can't come back and argue that a person they put on the stand who testified is a liar . . . Because they put someone on the stand to testify to the truth, they can't now say that testimony is untrue." The court denied

the objection, noting an accomplice liability instruction was appropriate given the jury could question B.N.'s credibility, adding that if the jury "can't be sure that Mr. Hernandez was the shooter, then the evidence supports a finding of guilt as an accomplice." The court gave an accomplice liability jury instruction, and the jury found Hernandez guilty of first degree murder without being asked to specify whether it was on an accomplice liability theory.

¶23        Hernandez argues "[t]he evidence was insufficient to support accomplice liability and the State was permitted to advance that theory for the first time in closing argument with no prior notice or introduction of evidence." The record, however, is to the contrary. More than five years before trial, Hernandez disclosed a notice of mitigating circumstances claiming (among other things) he was merely an accomplice and citing A.R.S. § 13-303. The State then requested an accomplice instruction in a January 2019 filing, months before trial, and Hernandez never withdrew his mitigating circumstance. Moreover, the final jury instructions (given by the court before closing arguments) included an accomplice instruction. Thus, the record does not support Hernandez' lack of notice and due process arguments. *Cf. In re Jessie T.*, 242 Ariz. 556, 560 ¶ 18 (App. 2017) (cited by Hernandez, but stating "the Sixth Amendment is satisfied when a defendant (1) receives adequate notice that the State is pursuing accomplice liability and (2) the State has not affirmatively misled the defendant").

¶24        This court reviews jury instructions for an abuse of discretion and "will not reverse a conviction based on the trial court's ruling on a jury instruction 'unless we can reasonably find that the instructions, when taken as a whole, would mislead the jurors.'" *State v. Rutledge*, 197 Ariz. 389 393 ¶ 15 (App. 2000) (citations omitted). Citing *State v. Noriega*, 187 Ariz. 282 (App. 1996), Hernandez contends that "an improperly instructed jury, particularly in the context of accomplice liability (and mere presence) is cause for reversal." Hernandez also suggests that, because the jury asked about accomplice liability during deliberations, the instruction "clearly" influenced their deliberations and "may also have been the sole basis for finding of guilt." On the record presented, Hernandez has shown no error.

¶25     The instruction given is a proper accomplice instruction. A.R.S. §§ 13–301, 303(A)(3). Hernandez argues the evidence did not support such an instruction. But as Hernandez quotes in his brief, the State argued during closing that the evidence would support an accomplice finding if the jury agreed with the defense theory:

> [I]t's the State's theory . . . that Mr. Hernandez is the shooter in this case. . . . I anticipate that the defense is going to stand up in closing argument and argue that their client was not the shooter. . . . I believe . . . the jury could conclude . . . that even if, hypothetically speaking, [B.N. and another individual] were the two shooters in this case that Mr. Hernandez was still an accomplice of them and assisted them in committing the murder. . . . So, while no, it's not our theory that he's an accomplice, I think the evidence would support an instruction.
>
> It would be circumstantial evidence, certainly, but there is evidence that would support Mr. Hernandez, if he is not the shooter, of being an accomplice to premeditated murder.

Hernandez then argued during closing that B.N. played a role in the murder.

¶26     Hernandez argues that the accomplice instruction manufactured "a mutually exclusive factual scenario that [B.N.] was somehow both truthful and untruthful regarding the circumstances of the killing, and that the State then is no longer acting in good faith because it is 'inviting the jury to reject' the notion that [B.N.] (their own witness) is telling the truth." The accomplice instruction, however, allowed the jury to consider all possibilities, including if they questioned B.N.'s credibility and testimony and believed that Hernandez could have helped B.N. commit the murder (instead of the other way around). In *State v. Garza*, when a similar situation arose, the court did not find error. 216 Ariz. 56, 66 ¶ 43 (rejecting challenge to accomplice liability, even when the State's theory was that the defendant "acted alone," given Garza's blood was found on the passenger side of his car, suggesting that someone else drove the car away from the crime scene; the defense argued that this person committed the murders.).

¶27        B.N. testified that Hernandez shot and killed the victim. Hernandez argued B.N. was the shooter. Given this defense theory, an accomplice instruction was appropriate. Hernandez has therefore shown no error in the court giving that instruction.

### III.    Hernandez Has Shown No Prosecutorial Misconduct.

¶28        Hernandez argues prosecutorial misconduct "tainted the trial" and "prejudiced" Hernandez. Hernandez claims there were multiple instances of improper questioning, suggestions, implications to the jury and times when the State "engaged in personal attacks or inappropriate behavior in the courtroom."[3] To show prosecutorial misconduct, "a defendant must demonstrate that the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Hughes*, 193 Ariz. 72, 78-79 ¶ 25 (1998). "To reverse, prosecutorial misconduct must be present, and a 'reasonably likelihood [must] exist[] that the misconduct could have affected the jury's verdict, thereby denying the defendant a fair trial.'" *State v. Acuna Valenzuela*, 245 Ariz. 197, 216 ¶ 66 (2018) (citations omitted). When a timely, specific objection is made, claims of prosecutorial misconduct are reviewed for harmless error; absent such an objection, the review is for fundamental error resulting in prejudice. *See id.* Because there were objections to some instances Hernandez references, those are addressed first, under the harmless error standard.

¶29        Hernandez first argues the State improperly asked the victim's mother if the victim had "gotten involved in something he should not have gotten involved in?" But Hernandez timely objected as argumentative and the court sustained the objection, also directing the State to avoid leading questions. Similarly, Hernandez' assertion that, during a bench conference outside the jury's presence, the State asked a question that could open the door to precluded testimony is negated by the court sustaining Hernandez' objection. Nor does an exchange arising out of the State asking a witness whether she knew if Hernandez took any tires off the Chrysler 300 before he sold it show error, a prerequisite for a harmless error claim. *See State v. Bible*, 175 Ariz. 549, 588 (1993) ("When an issue is raised

---

[3] Hernandez also "incorporates by reference and submits additional instances raised to the trial court that would constitute impermissible prosecutorial misconduct." Such an attempted incorporation by reference is inadequate to sufficiently develop the argument on appeal. *See Sanchez*, 200 Ariz. at 166 ¶ 8 (finding waiver for failure to develop an argument).

but erroneously ruled on by the trial court, this court reviews for harmless error."). Similarly, given Hernandez' argument at trial that the law enforcement investigation was inadequate, he has shown no error in the State asking about the background of the investigation (even assuming Hernandez made a timely, specific objection to the questioning).

¶30        Hernandez next points to statements made during the State's initial closing arguments. Hernandez claims the State vouched for B.N. by stating, "It's up to you whether you're going to believe him or not, but he at least gives you some information about what happened. If we don't put him on the stand you have no information about what potentially happened inside of that shed, at least direct evidence of such." A lawyer, prosecutor or defense counsel, stating witness credibility is "up to" the jury, is a correct statement of the law, not improper vouching. And when Hernandez objected to the argument, the State moved on and it was not repeated.

¶31        Hernandez' other arguments also fail. The prosecutor stating during closing argument that an issue was "a red herring by the defense" does not constitute improperly "directly attacking" Hernandez' trial counsel or counsel's veracity. Similarly, Hernandez has not shown that asserting in closing that a defense was "a strategy employed to distract you" was improper. The State in its closing also stated, "If you are firmly convinced based upon the evidence in this case that the defendant deliberately killed [T.L.], you must find him guilty of first degree murder." Defense counsel objected, citing a misstatement of the burden and instructions, which the court overruled. Hernandez has shown no reversible error in the State's initial closing argument.

¶32        During the State's rebuttal closing argument, Hernandez claims "the prosecutor suggested to the jury that they were obligated to find Appellant guilty of first-degree murder, ignoring the possibility of lesser-included offenses and misstating the State's burden of proof." Contrary to Hernandez' assertion, that portion of the State's closing argument was:

> The evidence in this case clearly shows that, in fact, this was premeditated murder. If you are firmly convinced, stand your ground. Deliberate, talk to your fellow jurors, scrutinize the evidence. Don't compromise for the sake of compromise on the most important civic duty that we have. A second degree murder conviction would not be a refle[ction] of the

truth of what the defendant did to [T.L.] based
upon the evidence in this case. Your verdict in
this case will determine if the defendant's plan
to get away with it succeeded.

Defense counsel objected, claiming he was opposing "her last statement
when she said that if you – essentially if you come back with second degree
murder then you're not doing your job because then he gets away with it."
The court, however, could have properly concluded that the argument was
based on the evidence before the jury and did not misstate the juror's
obligations or the court's instructions.

¶33            A superior court "is in the best position to determine the effect
of a prosecutor's comments on a jury." *State v. Newell*, 212 Ariz. 389, 402 ¶
61 (2006). At argument on Hernandez' motion for a new trial, the court
specifically stated, "I want the record to be clear that the Court was
impressed with the presentation of the case from both sides, and felt that
nobody engaged in any kind of misconduct." Hernandez has not shown
that the court erroneously resolved these instances of alleged misconduct.

¶34            For Hernandez' remaining misconduct claims, he made no
timely objection and must show fundamental error resulting in prejudice.
"A defendant establishes fundamental error by showing that (1) the error
went to the foundation of the case, (2) the error took from the defendant a
right essential to his defense, *or* (3) the error was so egregious that he could
not possibly have received a fair trial." *State v. Escalante*, 245 Ariz. 135, 142
¶ 21 (2018). Hernandez has not shown that the State's assertions, during a
hearing outside the presence of the jury, about changing prosecutorial
theories constituted fundamental error resulting in prejudice. Nor has he
supported, by record evidence, his claim that in a bench conference, "the
prosecutor was condescendingly or mockingly smiling at the court
referencing Appellant's trial counsel." For these reasons, Hernandez has
failed to show prosecutorial misconduct resulting in fundamental error.

## IV.     Hernandez Has Not Shown That Removing Juror 5 Was Error.

¶35            On May 21, 2019, after dozens of witnesses had testified and
the parties rested, the court gave final jury instructions, including
accomplice and mere presence instructions. The final instructions were for
a non-capital first degree murder charge, consistent with the State's
withdrawing its intent to seek the death penalty.

¶36        On Tuesday, May 28, 2019, after deliberating for several days, the jury sent the court a written question: "After last Thursday's end of deliberations, a juror felt threatened by a comment made [by] another juror. As of now, there is a stalemate due to the one juror not wanting to proceed if the other juror is present. How do you suggest we proceed?" After conferring with counsel, the court discussed the matter on the record with the jury, repeating the final instructions about deliberation and directing jurors to proceed in a respectful manner.

¶37        The next Monday, June 3, 2019, the jury sent the court another written question: "Your Honor, the jury is at an impasse. How would you like us to proceed from this point?" After conferring with counsel, over Hernandez' objection, the court read the standard criminal impasse instruction to the jury and deliberations continued. *See* RAJI (Criminal) 5th Standard Instruction 53 (2019).

¶38        Later that same day, the jury sent the court two more written questions: (1) "If an individual is found liable under accomplice liability of first degree murder, is the accomplice guilty of the same charge?"; (2) "Can we please have more information on definition of intentionally or with intent to and definition of knowingly?" After conferring with counsel, the court answered both questions in writing. As to first, the court wrote: "Yes. Finding a person guilty of first-degree premeditated murder as an accomplice is the same as finding that person guilty of first-degree premeditated murder." And for the second, the court wrote: "There are no additional definitions that can be provided. However, if you believe that additional argument from the parties would be helpful, please let us know."

¶39        The next day, the jury sent the court a written note: "We have a juror who wishes to be excused, number 5." When conferring with the parties, Hernandez' counsel stated, "what we're trying to avoid is a situation in which a juror is removed when there's a reasonable possibility that the removal is not because they're no longer – they haven't fulfilled their duties as a juror but because they have and they don't agree with other jurors." The court and parties agreed on a line of questioning, first of the foreperson and then, separately, Juror 5.

¶40        In response to the court's question, the foreperson said Juror 5 wanted to be excused because "[s]he feels she cannot continue due to religious reasons." Separately, and after admonishing her about the secrecy of deliberations, the court then asked Juror 5 why she wanted to be excused. Juror 5 answered,

> No. I cannot tell you why because if I tell you why, you just instructed me and I can't – without – how would I put this? Well, I think it initially started when we first started deliberating and an incident happened and it wasn't taken care of. And because it wasn't taken care of, now it's – it's something that's starting to bother me because I think it should have been taken care of and it wasn't. And I don't believe I can truly deliberate right now because it's affecting me . . . .

Juror 5 added:

> It's just so much that happened, and I feel that I'm being target and then I'm taking in consideration my religion. And I know I'm not supposed to take that into consideration, and I know I'm not supposed to also take – regarding the – the sentence. And now that's where I'm at because I feel I'm being targeted . . . So I can't proceed.

¶41　　　　Upon further questioning, Juror 5 said she was threatened by another juror who said he or she wanted to fight her. Hernandez then objected, stating the questioning was "getting too far deep into what the deliberations are . . ." After conferring with counsel, the court asked Juror 5, "Did you at any point in the deliberation room say that religion was impairing your ability to deliberate with your fellow jurors?" Juror 5 answered "No." The court then asked, "In any way are your thoughts on potential punishment invading your deliberations – your ability to deliberate with your fellow jurors?" Juror 5 again answered "No." The court then asked if it denied Juror 5's request to be excused, would she continue to meaningfully deliberate if there were further deliberations to be had, and she said "Yes." Juror 5 then returned to the jury room, and the court discussed the issue with the parties.

¶42　　　　During that discussion between the court and the parties, Juror 5 provided the court the following written note: "I would consider staying, I truly believe the outcome would be the same. And after thinking about everything that was said to me, I did say in the moment religious [sic] would play a rol[e] after I was emotion[al] and most of the jury attacking me." After reviewing the note with counsel, the court noted concerns that

14

Juror 5's statements during questioning conflicted with the note. Hernandez objected to further questioning of Juror 5, while the State sought to question the other jurors. The State then asked that Juror 5 be removed. The court took no further action that day.

¶43        After a couple of days of recess, over Hernandez' objection, the court again questioned the foreperson. The foreperson responded that Juror 5 had told the other jurors that she was considering religion and punishment in her deliberation. The court then brought Juror 5 back and asked her, "do you feel that you can continue to discuss the evidence with your fellow jurors if you were left on this jury?" Juror 5 said that she could. The court then asked if any of Juror 5's beliefs or potential punishment ramifications would impair her ability to consider the evidence, and she said it would not.

¶44        The court and parties then agreed upon language to instruct the jury to continue deliberations if they still had deliberations to finish. Because of scheduling difficulties, the jury was excused until July 8, 2019. On the afternoon of July 8, the jury sent the court the following written question: "If a juror ignores the law when deliberating a verdict, should that juror be dismissed?" The State asked the court to bring in the entire jury, reread the relevant jury instructions on following the law and ask if anyone could not follow the law. Hernandez' counsel moved for a mistrial, which the court denied, and then offered suggestions on questions the court planned to ask the jury.

¶45        The court then brought the jury back into open court and read the "Duty of Jury" instruction, adding "Essentially this is saying you are required to follow the jury instructions as well as the law contained within the jury instructions. So my question is: If you cannot follow the law as stated in the instructions, please raise your hand?" After several jurors apparently looked at Juror 5, Juror 5 then raised her hand in response to the question, asserting she could not follow the law as stated in the instructions.

¶46        Given that response, the issue was what should happen next. Contrary to his argument on appeal, Hernandez did not ask that the court "charg[e] the jury to return to deliberations," which would appear to have been error given Juror 5's definitive response. Instead, Hernandez asked for a mistrial, the most extreme possible remedy, *State v. Adamson*, 136 Ariz. 250, 262 (1983) ("A declaration of a mistrial is the most dramatic remedy for trial error"), which the court denied. The State asked the court to dismiss Juror 5, the defense stated that it had no other position and objected to any more questioning of Juror 5. The court granted the State's request,

removing Juror 5. The court explained the procedural history and its reasoning in considerable detail:

> In talking about Juror Number 5, there was some ambiguity going back to the prior record that the Court had with a question that she submitted personally to the Court versus answers she had given in Court. I brought her in. We cleared that up. The Court made a determination at that point, based on follow up questions with her, that she indicated she would be able to deliberate. That she was still willing to deliberate. And uphold her duty as a juror. And because she gave those answers and because of some of the other record that was made, the Court left her on. The Court found at the time that was the appropriate thing to do . . .
>
> I know that the defense asked for a mistrial. The Court didn't believe that this rose to the level of a mistrial. The Court wanted to, through its record, clarify whether or not this came down to an interpretation of the instruction of the law or an unwillingness to follow the law. I felt the suggestion that was proposed by [the State] was the most benign way to get that answer and to make a record as to that. I read the instruction . . .
>
> I will agree with the Defense though that the Court observed a few jurors, not all, but a few, turn around to her [when asked to raise their hand if they cannot follow the law as stated in the instructions] . . . [A]t which time she did raise her hand and I clarified on the record that it was Juror Number 5 in response, if you cannot follow the law as stated in the instructions, please raise your hand. And she raised her hand. So at this particular time, the Court now believes her ability not to follow – her inability, I should say, to follow the instructions and the law is grounds to have her removed.

After reconstituting the jury, the court properly instructed the jury to start deliberations anew. After deliberations, the jury found Hernandez guilty of first degree murder.

¶47         Hernandez timely moved for new trial challenging, among other things, the removal of Juror 5. The motion attached a three-page declaration by Juror 5, which provided Juror 5's perceptions, mental process and recollection of jury deliberations. The State moved to strike the declaration. *See* Ariz. R. Crim. P. 24.1(d) ("the court may not receive . . . an affidavit that relates to the subjective motives or mental process leading a juror to agree or disagree with the verdict"). Over Hernandez' objection, the court granted the motion to strike, a ruling he does not challenge on appeal.[4] After full briefing and oral argument, the superior court rejected his post-verdict challenge to the removal of Juror 5.

¶48         Hernandez argues the "court erred by removing Juror #5 for cause rather than declaring a mistrial or charging the jury to return to deliberations."[5] "The matter of excusing jurors is committed to the sound discretion of the trial court and, absent clear and prejudicial abuse of that discretion, its determination will not be disturbed on appeal." *State v. Milke*, 177 Ariz. 118, 122 (1993) (citations omitted). Rule 18.5(h)(3) gives trial judges "broad discretion to excuse a deliberating juror 'due to inability or disqualification to perform required duties,' and to substitute an alternate juror." *State v. Kolmann*, 239 Ariz. 157, 162 ¶ 17 (2016). "If the court excuses a deliberating juror due to the juror's inability or disqualification to perform the required duties, the court may substitute an alternate juror to join the deliberations . . . . If an alternate joins the deliberations, the court must

---

[4] Juror 5 retained counsel and moved for a mistrial, seeking a "remedy for a violation of her constitutional right to serve as a juror" and arguing the "jury was hung." In response, the State moved to strike Juror 5's motion for mistrial. Although the record does not include a ruling on these motions, the court did not grant Juror 5's motion for mistrial. *See State v. Hill*, 174 Ariz. 313, 323 (1993) ("A motion that is not ruled on is deemed denied by operation of law.") (citing cases).

[5] Hernandez begins this argument by stating that "[r]ather than repeat them here, Appellant's underlying Motion for New Trial adequately laid out the procedural and factual history of the trial court's dealings with Juror #5 once the jury was charged to begin deliberations." Any undeveloped argument Hernandez offers is waived. *See Sanchez*, 200 Ariz. at 166 ¶ 8.

instruct the jury to begin its deliberations anew." Ariz. R. Crim. P. 18.5(h)(3).

¶49      To be sure, the circumstances surrounding Juror 5 were unusual. From the record presented, however, the court proceeded carefully and cautiously in addressing the issue. Hernandez claims the court should not have dismissed Juror 5 and that it "committed prejudicial error by *removing* the offending juror, despite the warnings contained in" *United States v. Symington*, 195 F.3d 1080 (9th Cir. 1999) "and the proscription against removing a juror whose position might have *any possibility* of being related to the merits of the case." *Symington*, applying the Federal Rules of Criminal Procedure, is not binding here. Moreover, the facts in *Symington* differ substantially from this case.

¶50      In *Symington*, the jury sent the court a note seeking direction because "[o]ne juror has stated their final opinion prior to review of all counts." *Id.* at 1083. Another note followed, stating the jury felt that the juror could not properly participate in discussions due to her inability to focus and recall, her refusal to discuss her views and other concerns about her comprehension and retention of information, adding that it appeared the juror "had their mind made up." *Id.* Another note from an individual juror asked that the court release this juror because she would cause the jury to hang. *Id.* at 1088. With no further evidentiary basis noted, the court then found that the juror was either unwilling or unable to deliberate and replaced her, and a reconstituted jury found the defendant guilty. *Id.* On appeal, the Ninth Circuit vacated the conviction, stating, "that if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." *Id.* at 1087.

¶51      In this case, Juror 5 at first conveyed issues about punishment, religious concerns, personality issues with other jurors and herself and had asked to be removed herself because it was "too much" and that she was not sleeping. When asked by the court, Juror 5 first said she could continue to deliberate, and the court allowed her to do so. Later, however, the jury sent the court a question asking, "If a juror ignores the law when deliberating a verdict, should that juror be dismissed?" Following that question, and after conferring with counsel, the court asked the entire jury if anyone could not follow the law in the instructions. Juror 5 said that she could not.

**¶52**        Unlike *Symington*, none of this suggests that Juror 5 was removed because of her views of the merits of the case. Instead, she was removed when, in answering the court's question, she said she could not follow the law in the instructions. Juror 5 did not state her views on the merits of the case, she did not state what her verdict would have been or even that she was ready to return a verdict and she did not state that she was being coerced by the other jurors to return a specific verdict. Instead, she told the court she could not follow the law in the instructions, meaning the court had a duty to remove her because of her "inability . . . to perform the required duties." Ariz. R. Crim. P. 18.5(h)(3).

**¶53**        The court could have declared a mistrial and ordered a new trial. Instead, given a mistrial is the most extreme remedy, the court dismissed Juror 5, reconstituted the jury and instructed it to begin its deliberation anew. The court was authorized to do so, Ariz. R. Crim. P. 18.5(h)(3), and Hernandez has shown no abuse of discretion in the court selecting that remedy. On this record, Hernandez has shown no abuse of discretion in the court's decision to remove Juror 5, to reconstitute the jury and to have the reconstituted jury, after receiving further instructions on deliberations, proceed to verdict. *Milke*, 177 Ariz. at 122.

## V.        Hernandez Has Shown No Error in the Denial of His Motion for New Trial.

**¶54**        Along with challenging the removal of Juror 5, Hernandez also requested a new trial based on the accomplice liability instruction, the conviction by a death qualified jury, the admission of the water-well recording, claims of prosecutorial misconduct and sufficiency of the evidence claims. After full briefing and oral argument, the court denied the motion. A new trial may be granted if "the verdict is contrary to law or the weight of the evidence." Ariz. R. Crim. P. 24.1(c)(1). "Motions for new trial are not favored, and the trial court's denial of a motion for new trial will not be disturbed absent an abuse of discretion." *State v. Gulbrandson*, 184 Ariz. 46, 63 (1995). The superior court judge "sits as a thirteenth juror, and [she], as well as the jury must be convinced that the weight of the evidence sustains the verdict, or it is [her] imperative duty to set it aside." *State v. Fischer*, 242 Ariz. 44, 49 ¶ 14 (2017) (citation omitted).

**¶55**        To the extent Hernandez' motion for new trial claimed error based on the issues discussed above, the above discussion establishes the superior court properly denied the motion. To the extent Hernandez' motion asserted error on grounds he does not challenge on appeal, those grounds are waived. *See State v. Moody*, 208 Ariz. 424, 452 n.9 ¶ 101 (2004).

Hernandez does claim on appeal that there was insufficient evidence to establish premeditation because B.N., the State's lone eyewitness, "testified he was not in the room for the first shots fired, did not see what happened until moments later when he re-entered the room to discover T.L. already shot." Hernandez claims that, "[a]t *best*, the State had established a *prima facie* case for 2nd Degree Murder, but there was insufficient evidence of true premeditation with *actual* reflection." Hernandez has not shown the superior court erred in denying his motion for new trial on that ground.

¶56 The trial evidence showed that Hernandez repeatedly contacted T.L. earlier in the day, T.L. told B.A. that if he didn't come back then she could worry and B.N. testified that Hernandez asked, in advance, to "smoke" T.L. B.N. also testified that there was a break between Hernandez shooting T.L. the first time and the second round of shots that killed him. B.N. stated that in between the sets of shots, Hernandez comforted Eddie Boy, asking him if he was angry and telling him he would take care of it. T.L. then tried to escape and Hernandez shot him several additional times. The court also properly instructed the jury that

> "Premeditation" means that the defendant intended to kill another human being or knew he would kill another human being, and that after forming that intent or knowledge, reflected on the decision before killing. It is this reflection, regardless of the length of time in which it occurs, that distinguishes first degree murder and second degree murder. The difference between first degree murder and second degree murder is that second degree murder does not require premeditation. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion. The time needed for reflection is not necessarily prolonged, and the space of time between the intent or knowledge to kill and the act of killing may be very short.

"The necessary premeditation . . . may be as instantaneous as successive thoughts of the mind and may be proven by either direct or circumstantial evidence." *State v. Kreps*, 146 Ariz. 446, 449 (1985). On this record, there was sufficient evidence for the jury to find that Hernandez shot T.L. with premeditation, not the result of a quarrel or a heat of passion. Thus,

Hernandez has not shown that the court erred in denying his motion for new trial.

## CONCLUSION

¶57      Hernandez' conviction and resulting sentence are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:   AA